**JOHNSON & WALES COLLEGE**

v.

**Edward D. DiPRETE et al.**

**No. 81–395–Appeal.**

Supreme Court of Rhode Island.

Aug. 11, 1982.

Vetter & White, George M. Vetter, Jr., John A. MacFadyen, III, William J. McGair, Providence, for appellee.

Jeremiah S. Jeremiah, Jr., Arthur A. Thovmasian, Jr., Cranston, for appellants.

## OPINION

SHEA, Justice.

The city of Cranston (the city), the city's zoning board of review, and city officials including the mayor, the city solicitor, the building inspector, and individual members of the zoning board of review appeal from judgments entered in four consolidated actions tried in the Superior Court. The four actions arose from the May 1980 purchase by Johnson & Wales College (Johnson & Wales) of the former Cranston Hilton Inn (the premises) located in Cranston, Rhode Island, and its attempt to establish therein a college facility, including classrooms, a restaurant, and a dormitory. In opposition to Johnson & Wales' purchase, the city, through its various officials, amended the zoning and minimum-housing sections of the Cranston City Code (the city code) in a way that prevented Johnson & Wales from using the premises as it planned. Relying on several of the enacted amendments, the building inspector, John A. Rega (Rega), denied Johnson & Wales its requests for an occupancy permit and ordered Johnson & Wales to cease its use of the premises at the end of June 1980.

Within a period of several days, beginning on July 3, 1980, a great deal of activity by the parties to this action took place. The city and its officials brought suit against Johnson & Wales in civil action No. 80–2321 to enjoin Johnson & Wales from using the premises as a college. Johnson & Wales counterclaimed for a declaration that the amendments were unconstitutional both on their face and as applied. On July 8 and August 13, 1980, Johnson & Wales filed two appeals in the Superior Court in civil action Nos. 80–2354 and 80–2773 from two separate zoning board of review decisions that had affirmed Rega's cease-and-desist orders, which he had issued on June 5 and June 30, 1980. On August 4, 1980, Johnson & Wales filed civil action No. 80–2695 in which it sought relief similar to the request in its counterclaim in civil action No. 80–2321.

On July 8, 1980, the city obtained an order from the Superior Court in civil action No. 80–2321 restraining Johnson & Wales from using the premises. Johnson & Wales then petitioned this court for a writ of certiorari, and we stayed the restraining order pending our decision. On August 28, 1980, we denied the petition and reinstated the order. At that point, Johnson & Wales' use of the premises as a college ceased.

A trial justice of the Superior Court consolidated and heard these cases without a jury on January 30, February 2, and 6, 1981. On July 20, 1981, the trial justice issued a detailed decision finding in favor of Johnson & Wales. He found that the city had wrongfully denied Johnson & Wales an occupancy permit and that the zoning and minimum-housing amendments to the city code were unconstitutional on their face and as applied. Judgment entered on August 4, 1981, and the city filed its appeal to this court on the same day. We affirm the judgment.

The premises in question were constructed in 1959 and used as a hotel until Johnson & Wales purchased them in 1980. At first a hotel was a permitted use for the particular zone under the city code. Then in 1966, as a result of amendments to the city's zoning ordinances, the premises' locale was

designated a B–2 zone, which did not permit use as a hotel. The hotel continued, however, as a legal nonconforming use pursuant to the zoning enabling act, G.L. 1956 (1980 Reenactment) § 45–24–10. Under the amended zoning ordinance, a *college* was a *permitted use* in a B–2 zone after 1966.

On May 14, 1980, Johnson & Wales signed a real estate sales contract for the purchase of the premises for a total price of $4,500,-000. When it signed the agreement, it paid $500,000 toward the purchase price. Johnson & Wales closed the purchase on June 3, 1980, paying a further $1,500,000 in cash and giving back a ten-year $2,000,000 mortgage at 9½-percent interest and a thirty-year $500,000 mortgage at 5-percent interest. Its monthly debt servicing amounted to $28,516.66. Through the date of the closing a college was still a permitted use in the zone occupied by the premises.

On June 4, 1980, Johnson & Wales students began to move into the premises. During that summer, until the stay issued in August, about eighty-seven students lived there and two summer courses were held. Johnson & Wales planned to use the premises as a "multi-educational complex." The various uses would include a dormitory, food-service training classrooms, other conventional classrooms, a restaurant, and the admissions office. The maximum number of student residents was planned to be 369.

In the meantime, city officials had already decided to oppose Johnson & Wales' purchase. At a meeting of the city council on May 27, 1980, the mayor introduced two zoning amendments. Ordinance Nos. 5–80–7 and 5–80–8 would amend § 30–3 ("Definitions") and § 30–15 ("Schedule of Uses") of the city code by adding and defining the terms "college, universities and other institutions of higher learning" and by limiting the location of such institutions to commercial zones C–1 through C–5. At the same meeting one of the city councilmen introduced ordinance No. 5–80–1 to amend chapter 14 of the city code pertaining to minimum housing, which ordinance would prohibit the operation or occupation of a dormitory anywhere in the city.

During the month of June 1980 the city council and the mayor prepared and proposed a spate of further zoning and housing amendments. On June 2, 1980, ordinance No. 6–80–1 was introduced, which purported to set minimum housing standards for dormitories. At the city council's June 10, 1980 meeting other ordinances were introduced. Ordinance No. 6–80–2 proposed a definition of "dormitory" and prohibited the operation or occupation of dormitories in several zones, including the B–2 zone in which the premises in question were located. Ordinance No. 6–80–3 proposed to change the premises' zone designation from B–2 to B–1. The city code reserves B–1 zones primarily for single- and two-family dwellings and open spaces. Ordinance No. 6–80–4 added to the section of definitions a "tourist home" and "rooming houses." Ordinance No. 6–80–5 offered a further definition of a dormitory. Ordinance No. 6–80–6 allowed tourist homes and rooming houses in commercial zones C–1 and C–2. Finally, ordinance No. 6–80–7 established offstreet parking requirements for college facilities.

At the June 10 meeting the council also passed several resolutions. In these resolutions the council requested that the mayor direct the city solicitor to determine the feasibility of obtaining a restraining order against Johnson & Wales in order to give the council sufficient time to enact the pending ordinances. The council further resolved to request that the United States Attorney and the Rhode Island Attorney General investigate Johnson & Wales' acquisitions of real estate for the prior ten years.

While the city administration's legislative activity sped forward, the city also moved along a second front. On June 5, 1980, the day following the initial occupation of the premises by students, building inspector Rega, in his official capacity and on orders from the mayor, went to the premises to inspect them. Later he returned for a second inspection, this time accompanied by the mayor. On both occasions Rega saw

that the premises were being used as a college, including a dormitory.

On the same day, Rega issued his first cease-and-desist order to Johnson & Wales. His letter stated in part:

"You are hereby notified that in order for said building to be maintained and used as a dormitory the law requires a use and occupancy permit which must be issued by this office."

When Rega issued his order, he was aware that ordinance Nos. 5–80–7 and 5–80–8 had already been introduced in the city council.

Finally on June 5, 1980, after a previous public advertisement, the city council's ordinance committee held a public hearing on ordinance No. 5–80–1 and recommended its passage to the city council.

On June 11, 1980, Johnson & Wales notified Rega by letter that it disagreed with his June 5 order, but that it would nevertheless apply without prejudice for an occupancy permit. Rega inspected the premises again after Johnson & Wales sent a follow-up letter dated June 17, 1980. He saw the same uses he had seen previously.

Also on June 11, 1980, Johnson & Wales appealed Rega's June 5 order to the zoning board of review and the building appeals board.

On June 18, 1980, Johnson & Wales sued in the Federal District Court and obtained a temporary restraining order against the city. The court ordered the city to refrain from "taking any further actions to enact any or all of the proposed ordinances" and from "interfering in any way with plaintiff's obtaining of the appropriate permits and with plaintiff's lawful use and occupancy of the premises."

On the evening of June 18, 1980, the zoning board of review heard Johnson & Wales' appeal of Rega's June 5 cease-and-desist order. Johnson & Wales requested a withdrawal of the appeal without prejudice in light of the federal court order. The board denied the request and affirmed Rega's June 5 order. That decision was appealed to the Superior Court on July 8, 1980 in civil action No. 80–2354.

The ordinance committee of the city council planned to hold further public hearings regarding ordinance Nos. 5–80–7 and 5–80–8 on June 19, 1980. The meeting was properly advertised according to law. General Laws 1956 (1980 Reenactment) § 45–24–4. However, the mayor advised the committee not to hold the hearings because the outstanding order of the federal court would prevent action from being taken on the matter. The committee met but immediately adjourned. It set no new date for the hearings. The city council, which also had a meeting set for June 19, followed suit.

On June 27, 1980, Johnson & Wales voluntarily dismissed its suit in federal court. On the same day the mayor called for a special meeting of the city council to be held the following day. A display-type advertisement of the meeting was placed in the newspaper on the morning of the day scheduled for the meeting. On June 28, 1980, the council met, held a hearing and passed ordinance Nos. 5–80–7 and 5–80–8. The mayor immediately approved them.

On the following June 30, 1980, Rega went back to the premises for one more inspection. By letter dated June 30, 1980, Rega informed Johnson & Wales that he would deny it an occupancy permit and further ordered Johnson & Wales to cease and desist in its continued use of the premises. He stated that the enactment of ordinance Nos. 5–80–7 and 5–80–8 made Johnson & Wales' use of the premises illegal. Johnson & Wales immediately appealed to the zoning board of review, which body denied the appeal on July 22, 1980.

Over the course of the next few days the city enacted the remaining ordinances that were pending before the city council.

Johnson & Wales contests, on various statutory and constitutional grounds, the validity of the zoning and minimum-housing amendments and the actions of the building inspector in denying an occupancy permit. We will deal separately with each claim. We note that our review is limited to a determination of whether the trial justice's findings were clearly wrong. *Me-*

*solella v. City of Providence,* R.I., 439 A.2d 1370 (1982).

■ The first issue concerns whether the building inspector, Rega, could validly deny Johnson & Wales' request for an occupancy permit. Johnson & Wales made two requests for a permit, on June 11 and on June 17, 1980. Rega made several inspections between June 5 and June 30, 1980. He denied the requests in writing on June 30, 1980. Rega testified at the trial that it was his usual practice and duty to make an inspection upon request with "reasonable promptness" and to decide whether to grant or to deny the permit "within a couple of days" after an inspection. At the time of the purchase and closing and before passage of the amendments, a college was a permitted use in the zone. The change in use from a hotel to a college, however, would have required an occupancy permit to issue under § 30–47(c) of the city code even though the challenged use was a permitted use under the zoning ordinance then in force.

Johnson & Wales argues that the building inspector's authority to grant or deny an occupancy permit is ministerial only. It argues that since it had established a valid use under the previous zoning ordinances, the building inspector could not use his authority to defeat the use and occupancy of the premises as a college. It further points out that the sole purpose of such a permit is for local officials to acknowledge an owner's use of property. Also, it argues that enforcement of zoning or other ordinances is an improper function for local authority in deciding whether to grant or to deny permits. Instead, the authority to enforce zoning is in the courts exclusively.

The city's response is that Johnson & Wales began its use and occupancy of the premises before it applied for a permit. It's use of the premises was therefore unlawful and not a valid use prior to the zoning changes.

General Laws 1956 (1980 Reenactment) § 45–24–10 states that enactment of a zoning ordinance does not nullify a valid preexisting use.

"*Pre-existing uses saved.*—No ordinance enacted under the authority of this chapter shall prevent or be construed to prevent the continuance of the use of any building or improvement for any purpose to which such building or improvement is lawfully devoted at the time of the enactment of such ordinance."

Under the city's view this section is inapplicable to Johnson & Wales because its use was unlawful by virtue of its failure to seek an occupancy permit before moving students into and conducting classes on the premises.

As the trial justice found, the city is in error. That view would deny the courts the exclusive authority to enforce zoning pursuant to §§ 45–24–6 and 45–24–7. Furthermore, the city code by its terms does not prevent use and occupancy prior to the issuance of a permit.

Section 30–47(c)(2) of the city code requires an owner of property to apply for an occupancy permit when there is a change in use of existing premises to a different classification. The section further states:

"No such occupancy, use, or change of use shall take place without the issuance of an occupancy permit signed by the inspector of buildings. Such permit shall not be issued *until* the building, structure, premises, or land and *its uses*, and the uses incidental thereto, *have been inspected* and approved by such inspector." (Emphasis added.)

As we read this ordinance, the building inspector would not be able to determine whether or not an occupancy and use are valid until he actually inspects the building in question. That requires that the occupancy and use first be established.

A permit functions as an official record of approval that the use or occupancy complies with local ordinances as they are written at the time that the use or occupancy is established. When inspection reveals that the use or occupancy complies with all requirements imposed by law, the inspector's duty to issue the necessary permit is merely ministerial in nature. He may not use his

authority to thwart what is an otherwise lawful project. In *Wood v. Lussier,* R.I., 416 A.2d 690 (1980), this court held that mandamus would issue to direct a local building inspector to issue a building permit when the plaintiff's application conformed to all legal requirements. We find the *Wood* case to be indistinguishable from the case before us. The city's argument to the contrary is without merit.

At the time of the purchase a college was a permitted use. After Johnson & Wales submitted its first request for an occupancy permit, the building inspector delayed his response, then denied the permit about three weeks later. The denial came two days after passage by the city council and approval of the mayor of ordinance Nos. 5–80–7 and 5–80–8. Rega's written notification of the denial to Johnson & Wales relied expressly upon these ordinances. The trial justice found that the city's motive throughout this controversy was to prevent the entry of Johnson & Wales into Cranston. The mayor had characterized the purchase as "objectionable" when he first submitted ordinance Nos. 5–80–7 and 5–80–8 for consideration by the city council on May 27, 1980. The trial justice stated:

> "[V]ery telling of the City's motives was the resolution directing the City Solicitor to obtain temporary relief against use of the premises as a college in order to gain time so the amending ordinances could become effective; and the two resolutions requesting the U.S. Attorney and the Attorney General to conduct investigations into the 'operations, purchasing and acquisition of real estate' for the preceding ten years."

Furthermore, documentary evidence in the case records the interest of at least one city councilman in changing the zoning pattern back to the configuration preceding Johnson & Wales' purchase of the premises once "this whole dormitory issue" was settled.

The trial justice concluded that the three-week period that the building inspector took before denying the permit, during which time the city council began its consideration of amendments, constituted an un-reasonable delay that bore no rational relation to the public health, safety, and general welfare. In view of the inspector's usual practice of responding quickly to permit applications, the trial justice stated that the delay was

> "willful and for the sole purpose of permitting the proposed amendments to become effective so as to thwart the establishment of the College."

We conclude that it was not error for the trial justice to order that an occupancy permit issue from the building inspector.

The next issue concerns the validity of the ordinances themselves. Johnson & Wales attacks their validity on both statutory and constitutional grounds. In his decision the trial justice examined each ordinance with particularity, and he carefully stated his reasons for ruling them invalid.

Johnson & Wales first challenges the enactment of ordinance Nos. 5–80–7 and 5–80–8 under the statute governing zoning, chapter 45–24. It contends that these two ordinances are invalid because the city failed to comply with the notice provisions set forth in § 45–24–4. This provision requires a public hearing prior to the enactment, amendment, or repeal of any zoning ordinances of a general nature. Before the public hearing the responsible authority

> "shall give first notice of such public hearing specifying the time and place of such hearing by publication of such notice in a newspaper of general circulation within such city or town at least once each week for three (3) successive weeks prior to the date of such hearing."

When the mayor introduced ordinance Nos. 5–80–7 and 5–80–8 into the city council on May 27, 1980, the ordinance committee of the council scheduled a public hearing on them for June 19, 1980. Both parties acknowledge that three successive legal notices were published according to law prior to the date set for the hearing. The members of the committee and the city council convened for the hearing but adjourned immediately because the outstanding federal court order referred to earlier prevented

them from taking further action on any of the proposed zoning ordinances. When the committee and the city council adjourned, no new date for a public hearing was set. On June 27, 1980, Johnson & Wales voluntarily dismissed its suit in federal court and thereby effectively dissolved that court's restraining order against the city. On the same day the mayor called a special meeting of the city council to be held on the following day, June 28, 1980. The single display-type advertisement referred to earlier was placed in the newspaper on June 28. The city council met and passed ordinance Nos. 5–80–7 and 5–80–8. The mayor immediately signed them into law.

Johnson & Wales argues that since the city council and its ordinance committee adjourned the June 19 meeting without setting a new date for a hearing, the city was required to publish three new successive advertisements under § 45–24–4. The city responds that the June 28 meeting was merely a continuation of the June 19 meeting. It further maintains that the display advertisement published on June 28, 1980, satisfied the statutory notice requirement by being in substantial compliance therewith. The city blames Johnson & Wales' federal court restraining order for postponement of the meeting. It argues that the college should not be permitted to thwart "the City's efforts to act pursuant to its authority" and force it to start over under § 45–24–4, given the initial proper notice.

The trial justice concluded that the circumstances required the city to republish notice in accordance with § 45–24–4. Thus the single newspaper advertisement published on the morning of the date of the special meeting of the city council was not sufficient to meet the statutory requirements. We conclude that the trial justice was correct.

It has long been the rule in this state that the notice requirement must be strictly adhered to.

"[The language of § 45–24–4] is clear and mandatory. The provisions relating to first advertising the notice of public hearing on a proposed amendment are in form and substance mandatory conditions precedent to the proper exercise of the power thus delegated to the council." *Rhode Island Home Builders, Inc. v. Budlong Rose Co.*, 77 R.I. 147, 152, 74 A.2d 237, 239 (1950).

The clarity of the section requires that we not ignore procedural irregularity or treat it as inconsequential. The city's argument that it acted in substantial compliance with the notice requirement once the federal restraining order was dissolved has no merit. Nor is there merit in its contention that the special meeting called by the mayor for June 28 was a continuation of the adjourned June 19 meeting. As interpreted by *Rhode Island Home Builders, supra*, the words of the statute do not suggest that substantial compliance with its notice provisions is acceptable. Moreover, the record is bare of any inference that the June 19 meeting was continued to a future date. The city council merely adjourned that meeting without setting a date and time for a new meeting. It is true, of course, that what barred the June 19 meeting was the outstanding federal court order prohibiting any amendment to the city code which would prevent Johnson & Wales from using the premises. Likewise, any meeting to consider such amendments taking place during the life of this order would be barred. This, however, would not have prevented the city council from actually continuing the meeting and setting a new date while recognizing that further continuances would be necessary throughout the life of the federal court order. The record shows a lack of any intent on the city's part to continue the June 19 meeting. The adjournment, without more, caused the effectiveness of the notice previously given for the June 19 meeting to end. The mayor's June 28 call for a special meeting was a call for an entirely new meeting and was only in reaction to the dissolution of the federal court order. He did not thereby revive the former notice. The situation called for an entirely new process of notification according to the terms of the statute. According-

ly, ordinance Nos. 5–80–7 and 5–80–8 are void for lack of notice under § 45–24–4.[1]

Johnson & Wales attacks the remaining ordinances, alleging that they are unconstitutional on several grounds. It claims that the city has confiscated its property and denied it all beneficial use thereof in violation of the Fifth and Fourteenth Amendments to the United States Constitution and art. I, sec. 16, of the Rhode Island Constitution. Johnson & Wales also claims that the city has acted arbitrarily and capriciously because the zoning and minimum-housing amendments bear no rational relationship to the public health, safety, morals, and general welfare in violation of both due process and equal protection under the Federal Constitution.

The trial justice considered each of these claims and found the ordinances unconstitutional. We hold that he was correct in his findings and conclusions.

■ It is well settled that legislation, including amendments to zoning and minimum-housing ordinances, enjoy a presumption of validity. *See Carpionato v. Town Council of North Providence*, 104 R.I. 490, 244 A.2d 861 (1968). The authority of cities and towns to enact zoning and minimum-housing ordinances is granted by the zoning-ordinance enabling act, G.L. 1956 (1980 Reenactment) §§ 45–24–1—45–24–22, and the minimum-housing-standards enabling act, §§ 45–24.2–1—45–24.2–11. It is equally well settled that the authority of a legislative body to enact laws and amendments thereto is limited by the requirement that that body act only in the proper exercise of the police power. A city or town council, whose responsibility it is to enact local ordinances, is not immune from this restriction. *See Atlantic Tubing and Rubber Co. v. City Council of Cranston*, 105 R.I. 584, 254 A.2d 92 (1969).

In the case of zoning ordinances and amendments, § 45–24–3 requires that such regulations "promote the public health and general welfare" and that they "be made in accordance with a comprehensive plan." The purpose of the comprehensive-plan requirement is to prevent the arbitrary or impulsive exercise of the power in enacting zoning rules and regulations. The phrase "comprehensive plan" was intended by the General Assembly to require that the zoning power be exercised in accordance with the police power and that every rule-making act bear a rational relationship to the public health, safety, morals, and general welfare. *See Mesolella v. City of Providence, supra*, and cases cited therein. In the case of minimum-housing ordinances, §§ 45–24.2–1 and –3 specifically state that the enabling legislation "is essential to the protection of the public health, safety, morals and general welfare" and that a city or town council may act only with this overall consideration in mind. Both the record and the trial justice's decision convince us that this was not the case with the ordinances under review here.

Ordinance No. 6–80–3 rezoned the premises from B–2 to B–1. The new designation permits single- and two-family dwellings, farming, open spaces, and conservation. The only other use that the ordinance would allow would be use as a hotel, a legal nonconforming use. Uncontradicted expert testimony established that to continue using the premises as a hotel would be a totally unprofitable venture.

"In my opinion, due to its location, due to the occupancy rate and the financial history it would be economically [u]nfeasible to sustain the operation of a hotel at this particular site."

The expert also said under cross-examination that alternative uses, such as an apartment building or housing for the elderly, would be similarly unsuited.

1. In December 1980 the city enacted ordinance No. 10–80–16 which repeated the provisions of ordinance Nos. 5–80–7 and 5–80–8. The trial justice listed ordinance No. 10–80–16 generally at the outset of his substantive examination of the remaining ordinances. Although he did not refer to the ordinance specifically in ruling that the city had acted in an unconstitutional manner, our review convinces us, as we shall later discuss, that like the other ordinances that the trial justice specifically addressed, ordinance No. 10–80–16 fails to relate rationally to the public health and general welfare and is therefore void.

■ A property owner suffers no confiscation of his property nor is he denied all beneficial use thereof merely because a regulation prevents him from using his property in the most profitable manner possible. *See Rhode Island Hospital Trust National Bank v. East Providence Zoning Board of Review,* R.I., 444 A.2d 862 (1982) (per curiam); *Rozes v. Smith,* 120 R.I. 515, 388 A.2d 816 (1978). However, we do not take this rule to mean that a property owner who was permitted by law to employ his property in a certain way can be reduced to any use that a city or town dictates according to its whim. A use that was permitted when the property was purchased may not abruptly be made illegal. General Laws 1956 (1980 Reenactment) § 45–24–10. The owner is entitled to beneficial use. *Atlantic Tubing and Rubber Co., supra.* We must emphasize that what Johnson & Wales did here was to take over an already existing structure with the intent of putting it to a use that the city had long ago expressly recognized as legal. The college is not in the position of a landowner who himself creates an illegal use and who then attempts to defend the use by claiming that it provides the only truly profitable use for his land. It is the city that created this problem of beneficial use. Its actions have invited economic disaster for Johnson & Wales. We find that the circumstances are a proper basis upon which to conclude that the property owner has been deprived of all beneficial use of its property. The trial justice was therefore correct in ruling ordinance No. 6–80–3 to be confiscatory in nature.

■ Ordinance Nos. 6–80–1, 6–80–2, 6–80–5, and 6–80–7 generally relate to the definition of dormitories, to their permitted location within the city, and to offstreet parking facilities for college buildings and classrooms. The definitions of a dormitory are found in ordinance Nos. 6–80–1(s), 6–80–2, and 6–80–5. Each specifically excludes from the definition "a building containing sleeping rooms connected with a monastery, convent or rectory." Ordinance No. 6–80–7 establishes offstreet-parking requirements expressly made applicable solely to colleges. The parking requirements differ from requirements already contained in the city code in § 30–26(i).

The trial justice found that the distinction between a college and a religious institution in reference to dormitories and the differing parking requirements violated Johnson & Wales' right to equal protection under the Fourteenth Amendment. The record contains no evidence that establishes any sort of rational basis for these distinctions. Nor is there evidence in the record that provides a rationale for the city to establish differing parking requirements. We conclude that it was proper for the trial justice to rule that ordinance Nos. 6–80–1(s), 6–80–2, 6–80–5, and 6–80–7 are void on equal-protection grounds.

■ The final issue is whether the enactment of ordinance No. 6–80–1 (exclusive of subpart (s)) is an arbitrary, capricious, irrational, and unreasonable exercise of the city's authority to enact minimum-housing ordinances.[2] Ordinance No. 6–80–1 added to the city code sections for minimum housing detailed provisions covering dormitories.

Johnson & Wales argues that subparts (b), (c), (n), and (*o*)(3) are constitutionally offensive for their failure to serve the public health and welfare rationally. These particular subsections are central to Johnson & Wales' ability to operate a dormitory in the premises.

Subparts (b) and (c) require that a dormitory contain "one approved flush toilet and lavatory basin" and "at least one bathtub or shower bath" for every two persons residing therein. Subpart (n) requires that a dormitory room used for sleeping purposes by one person shall contain 140 square feet of floor space and that a room occupied by

**2.** The trial justice ruled that subparts (q) and (r) of ordinance No. 6–80–1 were actually zoning amendments because they dealt with the location of dormitories rather than their environmental quality. As zoning ordinances he invalidated these subparts as he invalidated ordinance Nos. 5–80–7 and 5–80–8; the city had failed to give notice as required by G.L. 1956 (1980 Reenactment) § 45–24–4. We are in full agreement with this ruling.

two or more persons shall contain an extra 80 square feet of floor space for each additional person. Subpart (o)(3) requires that a dormitory maintain two kitchen facilities per floor or one such facility for each thirty occupants.

At the trial Johnson & Wales presented the expert testimony of Leonard C. Mandell. Mr. Mandell is a mechanical and environmental engineer whose expertise lies in combustion, heating, ventilation, and public health. He has done extensive work with building, fire, and sanitation codes. He characterized such codes to be "tool[s] in my profession [that I use] almost daily."

Mandell gave extensive and detailed testimony dealing with the structural nature of the premises, relevant building and sanitation codes, and nationally accepted standards regarding the construction and quality of college dormitories. In his expert opinion, Mandell concluded that the then-existing premises, if used as a dormitory, would far exceed the necessary minimums that were set forth as recognized and accepted building-sanitation standards for dormitories. In the areas of sanitation, ventilation, thermal comfort and control, space, and fire safety, he concluded that ordinance No. 6–80(b), (c), (n), (o)(3) contained unreasonable requirements to safeguard the health, welfare and safety of dormitory occupants.

The city tried to rebut the testimony with its own expert. In his decision the trial justice found the expert testimony that Johnson & Wales presented to be more credible. Based thereon he concluded that ordinance No. 6–80–1(b), (c), (n), (o)(3) lacked any rational relationship to the public health, safety, morals, and general welfare and that these sections were unconstitutional.

The city argues that its expert provided a conflicting view of things that made Johnson & Wales' position on the matter "debatable." The city contends that debatability establishes that the ordinance is a rational legislative enactment. Apparently its position is that since the matter is made debatable by the existence of conflicting testimo-

ny, it becomes impossible for a challenger to prove that legislation is unconstitutional beyond a reasonable doubt. We disagree.

The city's position seems to be that the mere presentation of any rebutting evidence buttresses the presumption of the ordinance's validity. The flaw in the city's argument is that it completely ignores the role that factfinding must play. Rebuttal testimony is not the foundation of the ordinance's validity in this case. Rather, that foundation must be the credibility of the rebuttal and of all the relevant and material evidence which forms the basis of decision. Assuming that the city's expert indeed made Johnson & Wales' point debatable, the trial justice was required then to evaluate the evidence in his own mind and reach a decision. We have reviewed the record and conclude that he was not in error in ruling as he did.

Our view of the correctness of the trial justice's ruling on ordinance No. 6–80–1 and the ordinances previously referred to is supported in general by the circumstances in which the legislative action occurred. It is clear to us after a thorough review of the entire record that the city forgot that its prime legislative function is to act so as to preserve and promote the public health, safety, morals, and general welfare. Instead, its visceral reaction to Johnson & Wales' purchase of the hotel property sent the city hurtling along a course of action designed to prevent the new owner from enjoying the property in any beneficial manner. We have already said that a zoning amendment passed "to directly prevent plaintiff's project" is a "significant" factor in judging a city's or town's adherence to constitutional norms. *Mesolella v. City of Providence*, R.I., 439 A.2d at 1375. In *Mesolella*, the city of Providence amended its zoning ordinances in response to much public outcry against the proposed construction of multifamily, public-assisted, section-VIII housing. The amendment rezoned the construction site from multifamily to single-residence use. The trial justice specifically found that the city had acted merely to prevent the plaintiff from con-

structing the housing. This court held that such a finding warranted the conclusion that the city had failed to enact the amendment in accordance with its comprehensive plan and had therefore acted in excess of its police power. The evidence in this case shows that the city's only objective was to prevent Johnson & Wales from using the premises as a college facility. Such action to deny an otherwise legal and permitted use is intolerable.

For all of the forgoing reasons the appeal is denied and dismissed. The decision below is affirmed, and the papers of the case may be remanded to the Superior Court.