**TOWN OF JOHNSTON**

v.

**Leonard PEZZA et al.**

**No. 96–408–Appeal.**

Supreme Court of Rhode Island.

Jan. 21, 1999.

Patrick J. Dougherty, Providence, for plaintiff.

John B. Webster, Warwick, for defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

Revoking a building permit issued by his predecessor, a municipal building official decided that a proposed asphalt plant did not mix with applicable town ordinances. A Superior Court trial justice, however, concluded otherwise and found that, in revoking the permit, the new building official did not give the asphalt plant a fair shake. Because the asphalt-plant applicant failed to comply with applicable conditions precedent to obtaining a building permit—including without limitation, failing to submit a proper site plan to the municipality's planning board—and because the town's former building official had no authority to waive the applicant's compliance with these conditions precedent to the issuance of the building permit, we reverse and uphold the successor building official's revocation of the permit.

In November 1994, defendant, Granite Asphalt Corporation (Granite), applied for a building permit in the town of Johnston (town) to construct an asphalt batch mixing plant. Granite submitted its application to the town's building official, Anthony Izzo (Izzo). Because the town's longtime mayor had just suffered an electoral defeat, Izzo's days as the town's building official were numbered. Within days of receiving the application, Izzo issued a building permit to Granite. On February 7, 1995, a new building official assumed office and soon determined that the permit's issuance, as well as the asphalt plant's ongoing construction, did not comply with the town's ordinances. Consequently, the town, through its new building official, revoked the permit and ordered Granite to cease and desist from any further plant construction. After Granite ignored this order, the town attempted to enjoin Granite, as well as other affiliated individuals and entities, from proceeding with any further plant construction. Although work at the site was temporarily halted, the Superior Court eventually denied the town's request for injunctive relief and permitted defendants' installation of the plant to proceed. Notwithstanding the pendency of the town's appeal to this Court, Granite completed the construction and the plant is now operational. Nonetheless, because the plant's owners failed to comply with applicable conditions precedent to the building official's issuance of the permit, we reverse, enjoin defendants' continued operation of the plant, and remand this case to the Superior Court so that it may enter a judgment consistent with this opinion.

### Facts and Travel

The various individual and corporate defendants, Leonard Pezza, Constance Pezza, Robert A. Pezza, and certain Pezza-owned companies (Granite Asphalt Corporation, C. Pezza & Son, Inc., and Material Sand and Stone Corporation) (collectively, the Pezzas) owned a large block of property in the town. Bounded by Irons Avenue to the north, the Woonasquatucket River to the east, Sheridan Street to the south, and Endicott Street to the west, the property long had served as the commercial locus of the Pezzas' excavation and gravel-transportation businesses, as well as their crushing, screening, and separation operations.

In the summer of 1993, Robert A. Pezza (Robert), testifying as the president of Material Sand and Stone Corporation (Material Sand), discussed with his father, Leonard Pezza (Leonard), the possibility of buying a parcel of property that Leonard owned which abutted Irons Avenue (the proposed site). Robert intended to purchase the proposed site in order to erect and operate an asphalt batch mixing plant. To this end, in July 1993, C. Russell Hoffman (Hoffman), an employee of Material Sand, consulted with Izzo, who was then the town's building official, regarding the feasibility of installing an asphalt plant on the proposed site. At that meeting, Izzo apprised Hoffman that the proposed site was appropriately zoned for the Pezzas' intended industrial use, but that the applicant first would have to procure approval for the proposed asphalt plant from the Rhode Island Department of Environmental Management (DEM). On January 6, 1994, Robert, on behalf of what would become Granite,[1] applied for the requisite DEM approval. Thereafter, on April 27, 1994, DEM authorized the construction of a "Stansteel, Inc., Model TM 60, 200 TPH portable batch mix plant" at 100 Irons Avenue. According to the testimony of Ronald S. Marcaccio, the DEM official who had handled the application, Granite only enclosed plans for a TM–40 asphalt plant with its application.[2] Nevertheless, DEM's permit inexplicably approved a "TM 60" plant.[3]

After obtaining DEM's approval, Hoffman returned to Izzo, who instructed him to secure approval of the plans from the Johnston Fire Department Chief, an objective Hoffman accomplished during the first week of May 1994. Hoffman again returned to Izzo in late May or early June of 1994, this time armed with both DEM's and the fire chief's approvals. In July 1994, Hoffman, on behalf of Granite, attempted to apply for a town building permit. Because of an intervening tax-arrearage problem, however, Hoffman did not submit any formal application until November 23, 1994.

On that date, the day before Thanksgiving, Hoffman conferred with Izzo at the latter's office "right after lunch." Hoffman brought with him the DEM approval, a self-prepared site plan,[4] and the plot plan. With Hoffman at his elbow, Izzo proceeded to fill out the building-permit application while obtaining informational input from Hoffman as needed. Hoffman testified that, with respect to the DEM permit, Izzo claimed that "[this permit] covers the world *** that's all you need." After Izzo filled out the application, Hoffman tendered to Izzo a $1,670 check payable to the town for a building-permit fee. Thereafter, Hoffman testified, Izzo assured him: " 'Leave this with me, leave everything with me, I'll make this out.' It's a long weekend, Friday after Thanksgiving, I don't know, he says, I'll have it for you Monday morning." Notably, Izzo did not submit nor did he require Granite to submit a site plan for the plant to the Johnston Planning Board (board). Instead, on that next Monday, November 28, 1994, Hoffman returned to Izzo's office, whereupon Izzo issued the building permit to him for a TM–60, 200 TPH asphalt mixing plant at 100 Irons Avenue.

However, notwithstanding the permit's reference to a TM–60, 200 TPH plant, Granite

---

1. On January 6, 1994, the DEM applicant, Granite, did not exist, as it did not file its articles of incorporation until November 22, 1994, one day before Izzo completed the building-permit application.

2. "TM" indicates that the plant is "trailer-mounted" or portable; "40" indicates that the plant's maximum production rate is two hundred tons of asphalt per hour.

3. Although Stansteel, Inc. had not manufactured or sold a TM–60 model since 1971, the designation "60" denoted that the plant's maximum production rate would be two hundred and forty tons of asphalt per hour, a 20 percent increase in capacity over the TM–40 model.

4. As Hoffman testified, Izzo specifically requested that Hoffman produce a site plan for him:

> "He told me, early on, that he wanted a copy of the assessor's plan, where the proposed plant was going to be installed, particularly showing the lots that were going to be significant to the plant. Showing the offsets from various residential side property lines, any water, sewer, whatever. So, I took his advice, did what he wanted, and submitted this plan, which he accepted."

Notably, Hoffman, who was not a professional registered engineer, personally prepared the site plan.

began installation of a different type of asphalt plant that was three times more expensive than the one described on the permit application. Because Stansteel no longer made the TM–60, 200 TPH type of plant, Granite began to construct a stationary. RM–60 type of plant that could produce up to 20 percent more asphalt per hour than the permitted plant. Moreover, in addition to a larger production capacity, this type of plant was not trailer-mounted like the one that Granite had specified in its permit application. Granite retained another Pezza enterprise, C. Pezza & Son, Inc., to do some of the site-preparation work. This company began to install a twenty-foot-high earthen berm around portions of the surrounding residentially zoned area that extended along Endicott Street and Irons Avenue. It also erected a concrete retaining wall running parallel to Sheridan Street. But neither the wall nor the berm were mentioned or shown in the various plans that defendants had submitted to DEM and to Izzo.

On February 7, 1995, Gregory Smolley (Smolley) assumed the office of Johnston Building Official. In response to several inquiries concerning the lawfulness of the plant, Smolley reviewed the file and inspected the site. After completing his investigation, Smolley rescinded any and all building permits the town had issued for the plant. Communicated via an April 12, 1995, cease-and-desist order to Granite, Smolley's grounds for rescission and/or areas of concern included the following: (1) the DEM permittees were Robert and Material Sand, but not Granite, the named permittee on the building permit; (2) the permit application did not specify the plant's height; (3) the applicant failed to comply with section E, Industrial Performance Standards, of the town zoning ordinances (addressing compliance with, inter alia, air-quality, environmental-impact, traffic, water-consumption, and emissions criteria), and the applicant had failed to present this proposed industrial use to the Industrial Performance Commission for its review prior to permitting; (4) no

proper site plan existed for the project (as Smolley wrote, "[t]he only site plan I have is a copy of a plan, done over a copy of a zoning map, not to scale, and too dark to be legible"); and (5) work was occurring in areas other than those designated in the site plan.[5]

On April 18, 1995, the town filed a complaint in Superior Court, seeking a temporary and permanent restraining order to enjoin any further construction relative to the plant. Following a hearing on the motion for a temporary restraining order, the court allowed C. Pezza & Son, Inc., to move forward and pour footings for the asphalt plant. The court further authorized Smolley to inspect the location(s) of any footings poured to make sure that the location(s) reasonably conformed to the plans filed with the town. However, defendants were temporarily restrained from excavating and doing any other site work. Thereafter, on May 18, 1995, the Superior Court began hearings on the town's motion for a preliminary injunction. In August 1995, the Court consolidated these preliminary-injunction hearings with a bench trial on the merits. The nonjury trial spanned twenty-four separate sessions between May and November of 1995. On February 19, 1996, in a written decision, the Superior Court denied the town's motion for injunctive relief. As a result, and notwithstanding the town's appeal of the judgment to this Court, Granite decided to continue construction of the now operational plant at 100 Irons Avenue.

### Analysis

The town raises myriad challenges to the Superior Court's ruling, arguing that it is rife with reversible errors. These alleged errors are all based on the assertion that the town should not be estopped from revoking the plant's building permit because of its alleged unlawful issuance. The town claims that its former building official improperly issued the permit because: (1) Izzo based the issuance on the Pezzas' false statements and misrepresentations of material fact concerning the

5. On August 11, 1995, Smolley issued Robert a "supplemental" letter of rescission, adding to his grounds for revocation the allegation that the application for the building permit and accompa-

nying materials contained false statements and misrepresentations of fact, thereby further justifying the cease-and-desist order pursuant to G.L. 1956 § 23–27.3–114.6.

capacity and portable nature of the plant; (2) the Pezzas failed to comply with the Industrial Performance Standards section of the town's ordinances; (3) the trial justice misapplied the law as to chapter 22B of the Johnston Town Code (relating to soil erosion and sediment control); and (4) the Pezzas failed to comply with Johnston Zoning Ordinance 796, § 9 (zoning ordinance 796) by failing to submit and obtain approval of a proper site plan from the board before applying for a building permit. Zoning ordinance 796 requires an applicant for a proposed industrial use to submit a site plan to the board for its review and approval *before* any submission of a building-permit application. Because the Pezzas failed to do so, we hold that the town's building official properly revoked the permit for this reason alone. Accordingly, we do not reach or consider any of the other additional alleged justifications for revoking the permit.

Section 9 of zoning ordinance 796, entitled *"Site Plan Review for Industrial Uses,"* provides that "[p]rior to the application for a building permit for any industrial use a site plan for the proposed use or structure shall be submitted to the Planning Board for review." Johnston Town Ordinance, Art. XIII, § 9 (Aug. 1, 1979) (as amended in 1989). A registered land surveyor or a registered engineer must prepare the site plan. *See id.* § 9(1). It must be drawn to a suitable scale and contain specified information. *See id.* After this compulsory site-plan submittal, the board then must determine within forty-five days whether the site plan conforms to the ordinance's requirements and, if not, inform the applicant on how the plan must be amended to be acceptable. *See id.* § 9(2)(a)–(b). If and only if the board confers this approval and transmits the approved site plan to the building official, can the applicant apply to the building official for a building permit. *See id.* at § 9(3)–(4). Indeed, upon receipt of the board-approved site plan, the building official is required to include it as part of the building-permit record. *See id.* at § 9(4).

6. Although the April 12, 1995, cease-and-desist order did not refer specifically to the Pezzas'

The site-plan-submission process also requires the board to obtain a bond from the applicant (to cover the cost of all improvements to the site) and to fix the bonding period. *See id.* at § 9(5). Finally, during the construction process, the board must inspect the site to ascertain that the applicant's landscaping, construction improvements, and other building activities are consistent with the requirements of the approved site plan. *See id.* at § 9(7). Only after this inspection occurs and passes muster may the board "notify the Building Inspector of substantial site plan compliance and recommend the issuance of a Certificate of Occupancy for the premises." *Id.* at § 9(8).

■ Neither the Pezzas nor Izzo submitted a site plan for the proposed asphalt plant to the board; nor did the Pezzas comply with the remainder of the site-plan ordinance's requirements. Indeed, on direct examination, in response to a question regarding whether he was familiar with zoning ordinance 796, Izzo replied: "Somewhat. Vaguely. I don't recall the ordinance, no." On cross-examination, the Pezzas' counsel revisited the issue with Izzo, inquiring, "[a]re you familiar with an ordinance called Zoning Ordinance 796?" to which the former building official rejoined, "[n]ot that I can recall, no."

The trial justice made the following findings with respect to zoning ordinance 796:

"[1. Zoning ordinance 796] requires that a site plan for any proposed industrial use or structure be submitted to the Town Planning Board for review.

"[2.] That requirement has been imposed only once in the 62 applications for industrial uses or structures since the adoption of the [amendments to the] ordinance [in 1989].

"[3.] That requirement was not known to the former Town Building Official at the time of the application in this case.

"[4.] The failure to satisfy the requirements [of] Ordinance Number 796 was not raised in the current Town Building Official's first cease and desist order of April 12, 1995.[6]

noncompliance with zoning ordinance 796, it did specify that the building-permit applicant had

"[5.] That cease and desist order refers only to Article VII, Industrial Performance Standards, and not at all to Article XIII, Supplemental Regulation of the Town Zoning Ordinance, as amended by Ordinance Number 796.

"[6.] The defendants have not in fact complied with Ordinance Number 796." (Footnote added.)

Furthermore, the trial justice concluded that, notwithstanding the zoning ordinance's clear mandate that the building official may not consider a building-permit application for a proposed industrial use until the board has approved the proposed site plan, zoning ordinance 796 failed to specify any standards for the board's site-plan review. Because the town's former building official apparently had ignored this aspect of the zoning ordinance some sixty-one times out of a possible sixty-two occasions after its adoption in 1989, the trial justice further concluded that the remedy of permit revocation was too drastic a sanction for the Pezzas' noncompliance. Ultimately, the trial justice asserted: "All of the plaintiff's objections refer to procedural discrepancies. Eventually, the defendants must be permitted to build an asphalt plant on the site in question, even if the plaintiff were to be successful in this lawsuit." Therefore, he found that the board's review of the required site plan was· a mere procedural exercise.

█ We conclude that the trial justice's holding with respect to zoning ordinance 796 constitutes clear error. A building-permit applicant's compliance with zoning ordinance 796 does not constitute a mere empty formality. The ordinance is laden with substantive site-plan requirements that must be satisfied (and monitored for compliance throughout the construction process) before the industrial-use applicant can even apply for a permit, much less obtain a certificate of occupancy.[7] Thus, this was no mere procedural exercise. Moreover, a muscular rule of law depends on regular procedural exercise for its continued vitality. As Justice Holmes once remarked, "Men must turn square corners when they deal with the Government." *Rock Island, Arkansas & Louisiana Railroad Co. v. United States,* 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188, 189 (1920). Although it is unnecessary for us to comment on the nature or extent of the board's review of proper site plans as specified by this law, the zoning ordinance unmistakably requires an applicant for an industrial use to submit a site plan to the board for its approval *before* the building official can issue a building permit. In fact, such a submission is a condition precedent to the later submittal and potential building-permit approval by the town's building official. Because neither Granite nor Izzo even attempted to satisfy—much less fulfill—this condition precedent to the issuance of a building permit, Izzo's act of issuing the building permit without first obtaining an approved site plan from the board was ultra vires, and the Pezzas were not entitled to rely upon the inspector's unlawful issuance of the permit in proceeding to construct the asphalt plant. *Accord Technology Investors*

---

failed to submit a proper site plan for the project and that such a plan "must be approved and filed with this department."

7. These include a site plan for the proposed use or structure prepared by a registered land surveyor or registered engineer that contains the following information:
"Name and address of the applicant and the designer of the plan;
"Date, North arrow, contours at two foot intervals;
"Plat and lot number(s);
"Existing zoning classifications;
"Location of any existing buildings or structures on the site;
"Existing sewers, water lines and hydrants;
"Location, arrangement and dimensions of off-street loading spaces;

"Location, Height and Materials of walls, fences, screen plantings and other landscaping features;
"Ground cover, finished grades, slopes, banks and ditches;
"Location, proposed use and general exterior dimensions of principal and accessory buildings and sign;
"Percentage of the area to be covered by buildings;
"Percentage of the area to be hard surfaced or paved[.]" Zoning Ordinance 796, § 9(1).
In addition, zoning ordinance 796 requires the board to obtain a bond from the applicant to cover the cost of all improvements, and the applicant must screen the outdoor storage of equipment and matter. *See id.* §§ 9(2)(5); 10(b)..

*v. Town of Westerly,* 689 A.2d 1060, 1062 (R.I.1997) ("estoppel cannot be applicable when the municipality's acts were clearly ultra vires"); *see also Almeida v. Zoning Board of Review of Tiverton,* 606 A.2d 1318, 1321 (R.I.1992) ("with respect to permits illegally issued, an appropriate municipal officer will not be estopped from nullifying such permit even though the permittee has acted pursuant to the permit"); *Town of Charlestown v. Beattie,* 422 A.2d 1250, 1252 (R.I. 1980) ("'[a]n act of the building inspector which is a nullity cannot vitiate the town's right to have zoning violations enjoined").

According to the town's zoning ordinance, Izzo, in his capacity as building official, possessed the authority to grant a building permit for an industrial use *only* after the board had approved a proposed site plan and transmitted it to him. However, Izzo had no authority either to waive submission of the site plan to the board and/or to approve a building permit without the board having conveyed to him an approved site plan. As we have stated, "[w]hen presented with [an] application for a building permit, the [building] inspector ha[s] no authority whatsoever 'other than to determine that the proposed construction conform[ed] precisely to the terms of the pertinent provisions of the zoning ordinance.'" *Zeilstra v. Barrington Zoning Board of Review,* 417 A.2d 303, 308 (R.I.1980) (holding that the building inspector lacked the authority to issue a building permit for a use which the Barrington zoning ordinance did not authorize for that location) (quoting *Arc–Lan Co. v. Zoning Board of Review of North Providence,* 106 R.I. 474, 476, 261 A.2d 280, 282 (1970) (third alteration in original)). In fact, in another case interpreting a Cranston zoning ordinance,[8] this Court held that when a building official's inspection reveals that the proposed use is consistent with all zoning requirements, the building inspector has no discretion whether to issue a permit—at that juncture, his obligation to issue the permit is ministerial in nature. *See Johnson & Wales*

*College v. DiPrete,* 448 A.2d 1271, 1276–77 (R.I.1982); *see also Wood v. Lussier,* 416 A.2d 690 (R.I.1980) (holding that the Court will issue mandamus to require a building inspector to issue a building permit for a proposed use that is consistent with all zoning requirements). Similarly, when the proposed use does not conform to the zoning requirements, the building inspector has no authority to issue a building permit. *See Ajootian v. Zoning Board of Review of Providence,* 85 R.I. 441, 445, 132 A.2d 836, 839 (1957).

Here, the building official had no authority to waive compliance with an entire section of the town's zoning ordinance and issue the permit anyway. Even if a variance were obtainable, the Pezzas did not seek or obtain any such relief from this zoning requirement. Moreover, the town council had in no way repealed or waived compliance with zoning ordinance 796, and this law still required an applicant for a proposed industrial use to submit a site plan to the board. No matter how many times the building official may have ignored this requirement in the past, the law remained unchanged when the Pezzas applied for this permit: the building official had no authority to issue a building permit for an industrial use without the applicant first obtaining board approval of a proposed site plan that conformed to the requirements of zoning ordinance 796. Accordingly, we hold that the trial justice's finding that the building official could waive compliance with this ordinance because it was merely a procedural exercise constitutes reversible error.

For this reason, the town's appeal is sustained. We vacate the judgment, reinstate the building official's revocation of the building permit, order the defendants to cease and desist any and all asphalt operations at the plant, and remand this case to the Superior Court (1) for entry of a judgment consistent with this opinion in favor of the town; and (2) for such further and supplementary pro-

8. Section 30–47(c)(2) of the Cranston City Code provided:

"No such occupancy, use, or change of use shall take place without the issuance of an occupancy permit signed by the inspector of

buildings. Such permit shall not be issued until the building, structure, premises, or land and its uses, and the uses incidental thereto, have been inspected and approved by such inspector."

ceedings as may be necessary to secure the defendants' compliance with all applicable town ordinances before this plant (or any modified or downsized version thereof) shall be permitted to resume operations.