**WOMEN'S LIBERATION UNION OF RHODE ISLAND, INC., et al.,**
Plaintiffs,

v.

**Richard J. ISRAEL, Attorney General for the State of Rhode Island; and Deeb G. Sarkas, Liquor Control Administrator for the State of Rhode Island, Defendants.**

Civ. A. No. 74–139.

United States District Court,
D. Rhode Island.

July 23, 1974.

Stephen J. Fortunato, Jr., Pawtucket, R. I., for plaintiffs.

W. Slater Allen, Jr., Asst. Atty. Gen. of R. I., Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

The issue to be resolved in this litigation is whether § 3–8–5 R.I.G.L.1956 (1969 Reenactment) is facially unconstitutional in that it violates the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.

On June 5, 1974 Doorley's Tap, in Providence, Rhode Island refused to serve alcoholic beverages to the named plaintiffs, all over 18 years of age and members of Women's Liberation Union of Rhode Island, Inc., simply because they were females who were not allowed, by virtue of the statute at issue, to drink beverages on the premises which was operating under a Class C retail liquor license.

As a result, they pray that this court declare § 3–8–5 R.I.G.L. to be unconstitutional under 28 U.S.C. § 1343 and 42 U.S.C. § 1983.

Section 3–8–5 of the R.I.G.L. in pertinent part reads:

> "Every person who shall . . . allow any . . . woman to drink beverages on premises licensed under retailers' class C licenses . . . shall be fined not more than five hundred dollars ($500) or be imprisoned not more than one (1) year, or both, and shall thereafter for the term of five (5) years next following his conviction, be disqualified from holding any license under this title."

Defendants, the Attorney General of the State of Rhode Island and the Administrator of the State Liquor Control, have among their statutory responsibilities the enforcement of R.I.G.L. § 3–8–5, which, in pertinent part, subjects holders of Class C retail liquor licenses, their agents and employees to criminal sanctions and disqualification from holding any liquor license for a five-year pe-

riod for serving or allowing any woman to drink beverages on their premises.

At the hearing before this court on July 26, 1974, it was also established and I so find that the plaintiffs on a previous occasion were told by the management of Doorley's Bar that if they persisted in their attempts to obtain alcoholic beverages on the premises "a complaint would be filed with the Providence Police Department", that of 1799 establishments in Rhode Island licensed to sell liquor by the drink, 146 of them operate under Class C licenses.

The Class C license is one category of retail liquor licenses created by Title 3 of Rhode Island General Laws. The Class C license authorizes the establishment of saloons or bars, where no food is cooked on the premises. See R.I.G.L. §§ 3–7–8, 3–7–9, 3–7–10. Among the other categories of retail licenses authorized by Title 3 are the package store (Class A), the bar-restaurant (Class B), and the beer and wine tavern (Class F). R.I.G.L. §§ 3–7–1, 3–7–3, 3–7–7, 3–7–14. All liquor licenseholders are prohibited from selling or serving liquor to minors. R.I.G.L. § 3–8–1. Only Class C licenseholders are prohibited from selling or serving liquor to adult women. None are prohibited from selling or serving liquor to adult men.

For reasons which follow I hold that the challenged portions of R.I.G.L. § 3–8–5 violate the Equal Protection Clause of the Fourteenth Amendment. As a result I do not reach plaintiffs' First Amendment challenge to the enactment.

## DECLARATORY INJUNCTION

◼ Although when an injunction is sought against the enforcement of a state statute on the grounds of unconstitutionality a three-judge court is required by 28 U.S.C. § 2281, a single judge has the jurisdiction to decide an action where only a declaratory judgment is sought. Mitchell v. Donovan, 398 U.S. 427, 430–431, 90 S.Ct. 1763, 26 L.Ed.2d 378 (1970); Doe v. Israel, 358 F.Supp. 1193 (D.R.I.1973), aff'd 482

F.2d 156 (1st Cir. 1973); Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). As the Court in Mitchell v. Donovan, *supra,* noted 398 U.S. at p. 431, 90 S.Ct. at p. 1765:

"We have stressed that the three-judge-court legislation is not 'a measure of broad social policy to be construed with great liberality,' but is rather 'an enactment technical in the strict sense of the term and to be applied as such.' Phillips v. United States, 312 U.S. 246, 251 [61 S.Ct. 480, 483, 85 L.Ed. 800]. Thus this Court's jurisdiction under that legislation is to be literally construed. It would hardly be faithful to such a construction to read the statutory term 'injunction' as meaning 'declaratory judgment.'"

In Samuels v. Mackell, 401 U.S. 66, 72, 91 S.Ct. 764, 767, 27 L.Ed.2d 688 (1971) the court stated:

"ordinarily a declaratory judgment will result in precisely the same interference with and disruption of state proceedings that the long-standing policy limiting injunctions was designed to avoid."

This language does not mandate a contrary holding. Even if declaratory and injunctive relief may be equated for purposes of the doctrine that federal courts should not interfere with pending state criminal prosecutions as this dicta indicates, they are not to be equated for purposes of determining the need for a three-judge court. Doe v. Israel, *supra.*

## STANDING

◼◼ Plaintiffs' standing to sue is not diminished by the fact that the sanctions of R.I.G.L. § 3–8–5 are directed against the licenseholder and its agents. In Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), the Supreme Court held that a private club's refusal of service solely due to race inflicted a direct injury on the person denied service and accorded him standing to challenge both the club's policy and the regulations of the state li-

quor board which required the club to enforce its policy. Id. at 168, 178–179, 92 S.Ct. 1965. Furthermore where it appears, as it does here, that the licenseholder's refusal to serve plaintiffs stems solely from a desire to avoid the sanctions of R.I.G.L. § 3–8–5 it is "idle to call the injury [to plaintiffs] indirect or remote." Truax v. Raich, 239 U.S. 33, 39, 36 S.Ct. 7, 9, 60 L.Ed. 131 (1915). Cf. Pierce v. Society of Sisters, 268 U.S. 510, 535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). It is further beyond question that an organization may represent its injured members in a judicial proceeding. NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); cf. Sierra Club v. Morton, 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

## IMPACT of the 21st AMENDMENT ON PLAINTIFFS' EQUAL PROTECTION CLAIM

In answering plaintiffs' equal protection challenge to § 3–8–5 defendants assert that "[the] key question then is, may the state disregard the consitutional requirements of equal protection in exercising its power to regulate sales of liquor conferred by the United States Constitution, Articles of Amendment XXI."[1] (Defendants' Pre-Trial Memorandum) (emphasis added). I address this question at the outset, since an affirmative answer would foreclose further examination of plaintiffs' equal protection claim.

 Defendants' contention that the Twenty-first Amendment supercedes the Equal Protection Clause of the Fourteenth Amendment must be rejected out of hand. Section two of the Twenty-first Amendment, on which this argument is predicated, was added as a saving clause to the national repeal of Prohibition to shield states wishing to remain "dry" from potential conflict with the Commerce Clause of the Constitution. Sail'er Inn, Inc. v. Kirby, 5 Cal.3d 1, 11, 95 Cal.Rptr. 329, 485 P.2d 529 (1971); see also California v. LaRue, 409 U.S. 109, 93 S.Ct. 390, 405, 34 L. Ed.2d 342 (1972) (Marshall, J., dissenting). Yet even in this respect, section two has not been held to work a wholesale repeal of the Commerce Clause as to the regulation of alcoholic beverages.

"To draw a conclusion from this line of decisions that the Twenty-first Amendment has somehow operated to 'repeal' the Commerce Clause wherever regulation of intoxicating liquors is concerned would, however, be an absurd oversimplification. If the Commerce Clause had been *pro tanto* 'repealed,' then Congress would be left with no regulatory power over interstate or foreign commerce in intoxicating liquor. Such a conclusion would be patently bizarre and is demonstrably incorrect. . . .

Both the Twenty-first Amendment and the Commerce Clause are parts of the same Constitution. Like other provisions of the Constitution, each must be considered in the light of the other, and in the context of the issues and interests at stake in any concrete case." Hosttetter v. Idlewild Bon Voyage Liquor Corp., 377 U.S. 324, 331–332, 84 S.Ct. 1293, 1298, 12 L. Ed.2d 350; see *Sail'er Inn, supra,* 5 Cal.3d at 11–12, 95 Cal.Rptr. 329, 485 P.2d 529.

In this case the controversy does not revolve primarily around the Commerce Clause. It is based entirely upon the

1. AMENDMENT XXI OF THE CONSTITUTION OF THE UNITED STATES [1933]

"Section 1. The eighteenth article of amendment to the Constitution of the United States is hereby repealed.

Section 2. The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.

Section 3. This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by conventions in the several States, as provided in the Constitution, within seven years from the date of the submission hereof to the States by the Congress."

Equal Protection Clause of the Fourteenth Amendment and possesses no interstate implications. Krauss v. Sacramento Inn, 314 F.Supp. 171 (E.D.Cal. 1970) vacated in part and remanded on other grounds sub nom. Krause v. Sacramento Inn, 479 F.2d 988 (9th Cir. 1973). Whatever its broad effect on the Commerce Clause, the Twenty-first Amendment does not displace the Equal Protection Clause of the Fourteenth Amendment. A statute which is reasonable under the Twenty-first Amendment may still be held unconstitutional for violation of the Fourteenth Amendment. Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 15 (1971). And the assertion that the state or its liquor board, "itself the repository of the State's power under the Twenty-first Amendment" LaRue, supra, 409 U.S. at 116, 93 S.Ct. at 396 is immune from the requirements of the Fourteenth Amendment cannot be entertained seriously in light of the Supreme Court's decision in Moose Lodge, supra. Justice Rehnquist, writing for the majority in Moose Lodge, held that regulations enacted by the liquor board pursuant to the state's powers under the Twenty-first Amendment violated the Equal Protection Clause where the operative effect of the regulations was to require a licenseholder to enforce its racially discriminatory policies.[2] See Wisconsin v. Constantineau, supra.

■ The state relies heavily on California v. LaRue, supra, which considered the impact of the Twenty-first Amendment in a First Amendment challenge to regulations of the California state liquor board which prohibited certain forms of live and filmed "lewd" entertainment in establishments licensed to sell liquor by the drink. Certain language of the court should be noted. It stated that while the Twenty-first Amendment does not abrogate the Fourteenth it "has been recognized as conferring something more than the normal state authority over public health, welfare and morals". Id. 409 U.S. at 114, 93 S.Ct. at 395. It also stated that "wide latitude as to choice of means to accomplish a permissible end must be accorded to the state agency which is itself the repository of the State's power under the Twenty-first Amendment." Id. at 116, 93 S.Ct. at 396. After concluding that the regulation in question bore a reasonable and not irrational relationship to a legitimate state interest the court found the regulation to be constitutional. This was only after it had reviewed the record and concluded that the State Liquor Commission's extensive hearings, which preceded the promulgation of the regulations provided a substantial factual basis in support of their rationality. LaRue appears to hold merely that state regulation of the sale of intoxicating beverages will be given deferential treatment so long as the basis for the regulation is factually demonstrated. As such, LaRue does not appear to alter the traditional equal protection analysis at all, as indicated by Justice Powell's similar treatment of an equal protection claim in his concurring opinion in Board of Ed. v. LaFleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974). In LaFleur, Justice Powell noted that school boards "must be accorded latitude in the operation of school systems and in the adoption of rules and regulations of general application". 94 S.Ct. at 804. Nonetheless, he found the mandatory maternity leave policy at issue violated the Equal Protection Clause because the "linkage between the boards' legitimate ends and their chosen means is too attenuated". 94 S.Ct. at 804. In this case in the face of an equal protection challenge even in the area of the Twenty-first Amendment, the state must demonstrate, by a strong factual showing, that the chal-

---

2. The liquor board regulations at issue in Moose Lodge were those which required each private club holding a liquor license to adhere to its constitution and by-laws. Since Moose Lodge's constitution and by-laws re- stricted guest service to whites only, the Court held that the State's regulations as applied, violated the Equal Protection Clause.

lenged classification bears a fair and substantial relation to a permissible legislative "object." Reed v. Reed, 404 U. S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); Kahn v. Shevin, 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974).

## EQUAL PROTECTION

■ Traditionally the Supreme Court has utilized a two-tiered Equal Protection test. In most instances a classification will not be disturbed unless it is without rational basis. Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); Green v. Waterford Board of Education, 473 F.2d 629 (2d Cir. 1973). On the other hand if the classification is based upon "suspect" criteria, Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), or impinges upon a "fundamental" interest, Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), it is subject to "strict" judicial scrutiny and will be declared invalid unless justified by a compelling state interest.[3] I need not, however, consider whether this sex-based discrimination requires strict judicial scrutiny, since I find that the challenged portion of § 3–8–5 fails to satisfy the less rigorous requirements of the so-called "rational basis" test.

■ A review of recent Supreme Court decisions indicates that the highly deferential "rational basis" test applied by the Court in the 1960's is being reshaped into a meaningful standard of review. The nature of the inquiry under this "invigorated" test has been variously expressed[4] but certain salient features have emerged. First, the Court will not speculate as to unexpressed permissible state interests which may rationally be furthered by a challenged classification, but will confine its inquiry to articulated or obvious objectives. LaFleur, supra, 94 S.Ct. 791 (Powell J., concurring); San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 17, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); Green v. Waterford Board of Ed., supra. Second, the Court will not accept factually unsupported assumptions to demonstrate the reasonableness of a challenged classification. U. S. Dept. of Agriculture v. Moreno, 413 U.S. 528, 535, 93 S.Ct. 2821, 37 L. Ed.2d 782 (1973). Judge Coffin, writing for the First Circuit in Wark v. Robbins, 458 F.2d 1295 (1972) noted at 1297, n. 4:

> "[T]he Court has moved away from its readiness to conceive any reasonable basis for differentiating the sexes, as demonstrated in Hoyt v. Florida, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed. 2d 118 (1961). . . . These observations . . . would argue for a requirement that the state must do more than allow a court to speculate and must in fact demonstrate a substantial relation to a legitimate state objective."

Third, the Court in a number of instances has abandoned the highly deferential formulation of the "rational basis" test, such as that expressed in McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961), that a classification must be sustained "if any state of facts reasonably may be conceived to justify it" and now demands that the classification bear a substantial or significant relation to the objective it is claimed to further.

---

3. In Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) a four member plurality of the Court held sex to be a suspect classification. To date, however, a majority of the Court has not held sex to be suspect. Indeed, Justice Douglas appears to have "defected" from the Frontiero plurality in his majority opinion in Kahn v. Shevin, supra, in which the Court upheld a Florida property tax exemption available to widows only under the rational basis analysis of Reed v. Reed, supra.

4. Compare e. g. language of Powell, J. in Weber v. Aetna Casualty & Sur. Co., 406 U.S. 164, 173, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972) with that of Marshall, J. in Chicago Police Dept. v. Mosley, 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); see also Green v. Waterford Bd. of Ed., 473 F.2d 629, 633 (2d Cir. 1973).

*Reed, supra* 404 U.S. at 75–76, 92 S.Ct. 251.

In Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920) quoted in *Reed, supra,* we find the following statement

> "[A] classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'"

■ Section 3–8–5 by its own terms mandates differential treatment for adult female and male patrons of Class C liquor establishments. In order to sustain the classification, we must find that it bears a fair and substantial relation to the object of the legislation. Defendants argue that section 3–8–5 is rationally related to the legislature's desire to protect women from exposure to saloons which "common experience" tells us are "frequently rowdy and given to violence." I note in passing that defendants have offered neither legislative history, *Moreno, supra,* nor factual data, Kahn v. Shevin, *supra,* to support their characterization of the state objective underlying § 3–8–5. A similar argument was raised and rejected in Seidenberg v. McSorleys' Old Ale House, Inc., 317 F.Supp. 593 (S.D.N.Y.1970) and in Bennett v. Dyer's Chop House, Inc., 350 F.Supp. 153 (N.D.Ohio 1972).

True in Cronin v. Adams, 192 U.S. 108, 24 S.Ct. 219, 48 L.Ed. 365 (1903) a Denver city ordinance which required "saloon keepers" to keep women off the premises was upheld as a reasonable exercise of the State's police power; that in Goesaert v. Cleary, 335 U.S. 464, 69 S.Ct. 198, 93 L.Ed.2d 163 (1948) a Michigan statute which prohibited women from employment as bartenders ex-cept in certain exceptional situations was also sustained. In fact most courts prior to 1950 found that statutes which forbade the sale of liquor to women in certain establishments, the employment of females in some businesses dispensing liquor, or even the presence of women in such places were constitutional as a reasonable exercise of the state's police power to protect the public safety, welfare and morals. E.g., Randles v. Washington State Liquor Control Board, 33 Wash.2d 688, 206 P.2d 1209 (1949); Great Atlantic and P. Tea Co. v. Danville, 367 Ill. 310, 11 N.E.2d 388, 113 A.L.R. 1386 (1937); Laughlin v. Tillamook County, 75 Or. 506, 147 P. 547 (1915); People v. Case, 153 Mich. 98, 116 N.W. 558, 18 L.R.A.,N.S., 657 (1908); Hoboken v. Greiner, 68 N.J.L. 592, 53 A. 693 (1902).

I recognize these decisions. On the other hand one need only look to a series of recent opinions to demonstrate the rapidly changing status of women in society.[5] It would be male chauvinistic blindness not to recognize the progress females have made during the last quarter century in their battle for equality. Nor can we ignore the vast changes in social mores and attitudes which have occurred since 1948.

With all due respect the Victorian ideas of the past in a contemporary setting are discordant anachronisms when juxtaposed with today's proven female intellectualism and physical ability.

In the social and moral climate of 100 years ago Justice Bradley stated:

> "Man is, or should be, woman's protector and defender. The natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life. The constitution of the family organization, which is founded

---

5. United States ex rel. Robinson v. York, *supra,* the Court struck down sex based discriminatory sentencing policies; Karczewski v. Baltimore and Ohio Railroad Co., 274 F.Supp. 169 (N.D.Ill.1967) the denial of consortium recoveries to a wife was declared unconstitutional where such recoveries were allowed to husbands; White v. Crook, 251 F.Supp. 401 (M.D.Ala.1966) overturned a statute which prohibited women from sitting on juries.

in the divine ordinance, as well as in the nature of things, indicates the domestic sphere as that which properly belongs to the domain and functions of womanhood. The harmony, not to say identity, of interests and views which belong, or should belong, to the family institution is repugnant to the idea of a woman adopting a distinct and independent career from that of her husband. . . .

. . . . The paramount destiny and mission of woman are to fulfil the noble and benign offices of wife and mother. This is the law of the Creator." Bradwell v. State, 16 Wall. 130, 141, 21 L.Ed. 442 (1873) (Bradley, J., concurring).

*Tempora mutantur, et nos mutamur in illis.*

In Kahn v. Shevin, *supra,* a majority of the Court held that state's desire to rectify the effects of past discrimination against women constitutes a legitimate state interest. Indeed, Justice Brennan, joined by Justice Marshall in dissent, found this state interest to be "compelling", in satisfaction of the requirements of strict judicial scrutiny. Both Justice Brennan's dissent and the majority opinion, which relies not on common assumptions about sex roles but on a strong statistical showing, firmly establish that in making this type of inquiry, a court must be careful to assure itself that the challenged classification does in fact work to alleviate the effects of past discrimination and does not instead serve to perpetuate them. The dangers of relying on sex-role stereotypes to uphold sex-based classifications were carefully explored by the plurality opinion in *Frontiero, supra.*[6] In holding sex to be a suspect classification, the plurality

opinion examined the use of sexual stereotypes by legislators and judges throughout our Nation's history and concluded that gross assumptions about the "natural and proper timidity and delicacy which belongs to the female sex", Bradwell v. Illinois, 83 U.S. (16 Wall.) 130, 141, 21 L.Ed. 442 (1873) (Bradley, J., concurring), have, "in practical effect, put women not on a pedestal, but in a cage". Id. 411 U.S. at 683, 93 S.Ct. at 1769; see, also, *Sail'er Inn, supra,* 5 Cal.3d at 20, 95 Cal.Rptr. 329, 485 P.2d 529. See, generally, Johnston and Knapp, Sex Discrimination by Law: A Study in Judicial Perspective, 46 N.Y.U.L.Rev. 675 (1971).

It is an odd sort of "protection" which denies a woman access to a public convenience "for her own good." As the Frontiero plurality made abundantly clear, a long history of discriminatory practices denying women access to rights and privileges available to men warn us to beware of invidious classifications masquerading as "beneficent" or "protective" legislation. The rationale asserted by the state would serve equally well to justify exclusion of women, for their own good and safety, from such other public places as crowded buses, subways and street corners. This is a convoluted kind of reasoning that has no place in today's society.

Kahn v. Shevin, *supra,* to be sure, demonstrates that a legislative desire to rectify the effects of past discrimination against women, when buttressed by a substantial factual showing may be a legitimate and, perhaps compelling state interest. The challenged portions of § 3–8–5 hardly further such an interest.

▮ Defendants have made no attempt to support factually their asser-

---

6. The Court's analysis of sex-based classifications in the post-Reed era casts considerable doubt on the continued vitality of Goesaert v. Cleary, 335 U.S. 464, 69 S.Ct. 198, 93 L.Ed. 163 (1948). In Goesaert, the Supreme Court upheld a classification similar to § 3–8–5, but factually distinguishable, see, McSorleys', supra, 317 F.Supp. at 606, which prohibited all women from employment as

bartenders in Michigan except for certain specified relatives of male licenseholders. The decision in Goesaert, which was predicated on unquestioning acceptance of sexual stereotypes, is completely at variance with the Court's rulings in Reed and Frontiero, and it is highly unlikely that it would be similarly decided if reconsidered today.

tion that the exclusion of women from saloons rationally furthers a legitimate legislative desire to protect women.[7]

I find no rational basis whatsoever for the blanket prohibition against women found in the statute in question.

Declaratory judgment is hereby granted.

7. Defendants' assertion that Cronin v. Adams, 192 U.S. 108, 24 S.Ct. 219, 48 L.Ed. 365 (1903), is dispositive of this case must also be rejected. The basis of that decision, that a state may condition the grant of a privilege upon a waiver of constitutional rights, has since been uniformly rejected, e. g. Keyishian v. Board of Regents, 385 U.S. 589, 605–606, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). See also, *LaRue, supra,* 409 U.S. at 137–138, 93 S.Ct. at 406–407 (Marshall, J., dissenting).