[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
"Old Narragansett was famous for its hospitality." William Weeden, Early Rhode Island: A Social History of the People, 158 (1910).
This matter was properly brought before this Court by landlords and tenants in the town of Narragansett, Rhode Island seeking relief by way of a declaratory judgment on their claim that a zoning ordinance of that town prohibiting more than three unrelated individuals from sharing a residential unit denied them rights secured by the United States and Rhode Island Constitutions. The plaintiffs asserted their claim against the town of Narragansett, the members of the town council, the building inspector and the finance director of the town. In addition to state claims raised under Article 1, Section 2 of Rhode Island's Constitution, the plaintiffs also seek remedies pursuant to 42 U.S.C. § 1983 (1988) for alleged deprivation of rights secured to them by the First, Fifth, Ninth and Fourteenth Amendments to the United States Constitution.
The only discovery filed in the matter was a request by the plaintiffs for admissions under Rule 26 acknowledging the authenticity of eleven designated documents. Following the admission by the defendants that all eleven items were authentic, the plaintiffs moved for summary judgment pursuant to Rule 56 of the Rules of Civil Procedure. The defendants objected to plaintiffs' motion, but agreed in the opening sentence of their Memorandum in Opposition that "The material facts in the instant case are not in dispute."[1]
The undisputed material facts to which this Court must apply the controlling law are simple and begin with the adoption of the contested ordinance on November 16, 1987. Section 17.2 of the Narragansett Zoning Ordinance defines "Family" as:
 One (1) or more persons related by blood, marriage or adoption using the same kitchen facilities and living together in a single dwelling unit as a single housekeeping unit; or no more then three (3) persons not related by blood, marriage or adoption using the same kitchen facilities and living together in a single dwelling unit as a single housekeeping unit. Roomers, boarders or lodgers are considered persons for the purpose of reaching the maximum of three (3) persons.
Section 2.1 of the Zoning Ordinance defines twelve zoning districts, five of which are residential. None of the descriptions of any of these zones uses the word "family." Section 5 of the Zoning Ordinance consists of a Table of Use Regulations, and there a chart makes reference to such terms as "single-family detached dwelling," "two-family dwelling or duplex," "multi-family dwelling structure," and "residential cluster developments of detached single-family dwellings." The Table of Use Regulations further indicates whether the aforedescribed types of dwellings are permitted, forbidden or allowed by special exception in the five zones denominated as residential.
The town interprets the ordinance to proscribe the renting of houses or apartments by owners to more than three persons who are not related by blood, marriage or adoption. Some of the landlord-plaintiffs in this action have been prosecuted by the Town for such violations and thus have been exposed to the sanctions provided in Section 8.5 of the ordinance.[2] Attached to plaintiffs' complaint are Narragansett Municipal Court summonses alleging that on or about December 13, 1991, Adele DiStefano and Vincent DiStefano committed the offense of "renting a single-family dwelling to more than three unrelated people." A similar charge was lodged against Claire Donilon for violating the ordinance on or around December 19, 1991, though the complaint was not issued until May 20, 1992. The Donilon complaint refers to a violation of "5.1 Use Regulations" and "(Code 01) single faily [sic] dwelling — more than three unrelated people living as single family unit." The affidavit of Adele DiStefano dated September 21, 1994 and filed in support of plaintiffs' Motion for Summary Judgment declares that plaintiff "Barbara Crocker has been charged with violating Narragansett Zoning Ordinances Section 5.1 Use Code 01 on 11-6-93 for allegedly renting/leasing to more than three (3) unrelated people in a single-family dwelling," and that her matter is still pending. The complaints against Adele M. DiStefano, Vincent DiStefano, Claire C. Donilon, as well as complaints against their co-plaintiffs, Robert J. DiCicco and Judith J. DiCicco, were dismissed; but according to the affidavit of Adele DiStefano, she and Vincent DiStefano and Claire Donilon all had to expend "time, energy and money" to defend themselves.
Among the documents before this Court is the July 20, 1992 transcript of a public hearing conducted by the Narragansett Town Council regarding an attempt to increase the number of unrelated persons who may live together from three to four. This transcript is clearly not the legislative history of an ordinance passed five years earlier, but the anecdotal comments of the persons offering testimony define the background dispute. Some townspeople felt that the restriction on non-married and non-related persons advanced the cause of public safety by prohibiting occupancy by more than three students or three vacationers; on the other hand, some people, principally lessors, testified that the persons to whom they rented, be they students or other unrelated persons, behaved in a proper and decorous fashion. It is not necessary for this Court to resolve this conflict in order to decide this case, and the Court simply notes the differing opinions.
Of considerable factual significance are written declarations by the top three law enforcement officials in the town, the Town Manager, the Building Official and the Chief of Police, whose input was solicited by the Town Council at the July 20, 1992 hearing. The statements of these officials were admitted to be authentic by the defendants; and on October 18, 1994, counsel for the defendants agreed that the declarations of these officials contained admissible evidence by persons competent to testify at a trial on the merits.
In his July 27, 1992 statement, Ronald F. Travers, the Narragansett Building Official, who is charged by law with overseeing the enforcement of the zoning ordinance, indicated a familiarity with the enactment of the ordinance under examination:
 In 1986, the enactment of the current definition of `family' along with the `rental registration program' was in response to numerous complaints about loud parties, littering, abusive language, speeding vehicles, garbage, parking and urinating in public. I assume that the public felt that establishing a limit on the number of individuals would eliminate or at least reduce the occurrences of the aforementioned activities.
 My opinion now, [sic] is no different than it was at that time; limiting the number of individuals will not prevent any of the stated complaints. . . . (Emphasis is that of Mr. Travers).
In a July 30, 1992 memorandum, Jeffrey Ceasrine, the Acting Town Manager, stated:
. . . . The complaints received pertaining to loud parties, littering, parking, and disorderly conduct are, in all probability, not a direct reflection of the actual number of tenants at a specific location. . . .
 . . . it is my conclusion that the problems that have been reported are not tied to the number of unrelated persons firmly enough to support a finite number [three (3) or four (4)] within the Zoning Ordinance for an occupancy limit. . . .
In his June 23, 1992 memorandum, Chief of Police John W. O'Donnell, Jr. declared:
 We are directly responsible for the disorderly conduct statues [sic] both state and local. We also enforce parking, noise ordinances and littering problems. The number of persons in a dwelling does not necessarily constitute a disorderly house; bearing this in mind the ordinance the Town Council is presently considering does not have a bearing of how we respond to a complaint. . . .
No one would question the right of a municipality to use the police power to address problems of disorderly conduct, parking, noise, littering and similar threats to public safety and welfare. The issue in this matter, however, is whether Narragansett may seek to curb or eliminate behavior it considers offensive by limiting not the number of persons who may occupy a particular dwelling but by delineating the type of relationship that must exist among the occupants of a unit in order for them to lawfully reside within it. To put it in another way, does the absence of a relationship by way of marriage, adoption or consanguinity reasonably demonstrate that a person has such a propensity to engage in the antisocial conduct that is of concern to the town of Narragansett that the town may interpose a bar that prohibits more than three unrelated persons from occupying a dwelling unit? This Court answers the question in the negative because the challenged portion of the Zoning Ordinance offends the mandates of the due process and equal protection clauses of Article 1, Section 2 of the Rhode Island Constitution.
Similar but distinct questions present themselves for both due process and equal protection analysis. When the question is limited strictly to substantive due process concerns, the inquiry is whether a fundamental right allows otherwise competent adults to reside together in groups larger than three even though they are unrelated. If they are protected by a fundamental right allowing such a living arrangement, then the defendants must show a compelling reason to interfere with this right.
When analysis is in the domain of equal protection, one of two approaches may be taken in a case such as this: if the challengers to this Ordinance can demonstrate that a constitutionally protected fundamental right is involved, then the legislative distinction between related and non-related persons will be strictly scrutinized and a high burden of justification placed upon the town of Narragansett. If no fundamental right is burdened by the Ordinance, then the only inquiry for this Court is whether there is a reasonable relationship between the objectives of the Ordinance and the means employed to attain them. It is the decision of this Court that the Ordinance cannot survive any of the tests outlined above.
Substantive Due Process
The plaintiffs claim a constitutional right for unrelated individuals to live in groups larger than three in residential units free from government prohibition or burdens. As the Rhode Island Constitution does not expressly enumerate this right, we must turn for the possible source of such a right to the due process clause found in Article 1, Section 2, being mindful at all times of the pronouncement of Article 1, Section 24:
 The enumeration of the foregoing rights shall not be construed to impair or deny others retained by the people. The rights guaranteed by this Constitution are not dependent on those guaranteed by the Constitution of the United States.
This is a case of first impression in this jurisdiction; and while the decision of this Court is grounded in the due process and equal protection clauses of the State Constitution, reference to the same clauses in the Federal Constitution and United States Supreme Court emending decisions is made in light of the Rhode Island Supreme Court's declaration that the "protections" of the two constitutions in this area are "similar." Kleczek v. RhodeIsland Interscholastic League, Inc., 612 A.2d 734, 740 (R.I. 1992). See also, In re Advisory Opinion to House of Rep.Bill, 519 A.2d 578 (R.I. 1987).
It is well-established that "in matters of individual liberty . . . the states are free to adopt a higher standard of protection than that compelled by the Federal Constitution."State v. Maloof, 114 R.I. 380, 389, 333 A.2d 676, 681, (1975). The Rhode Island Supreme Court has chosen to do that in some cases involving search and seizure, Id.; Pimental v. Dept. ofTrans., 551 A.2d 1348, 1352 (R.I. 1989), and jury trials, Statev. Vinagro, 433 A.2d 945 (R.I. 1981), but in other areas, such as freedom of expression, our Supreme Court, though acknowledging its prerogative to be "more protective of individual rights," has declined to do so. See, e.g., Town of Barrington v. Blake,568 A.2d 1015, 1018 (R.I. 1990). To date, it appears that the Rhode Island Supreme Court will follow at least the methodology employed by the United States Supreme Court in substantive due process and equal protection matters. See, Kleczek v. RhodeIsland Interscholastic League, Inc., 612 A.2d 734 (R.I. 1992);In Re Advisory Opinion to House of Rep. Bill, 519 A.2d 578
(R.I. 1987); Boucher v. Sayeed, 459 A.2d 87 (R.I. 1983).
While the method employed to determine what rights and liberties are protected by the due process clause of each constitution may be the same, there is no need to conclude that the results will be identical. As the United States District Court for the District of Rhode Island has pointed out, the framers of the 1986 Constitution intended to afford Rhode Islanders a greater protection than that which might be provided by the Fourteenth Amendment in the federal charter:
 The intent of the drafters in adding a `due process' and an `equal protection' clause to the new Constitution clearly was to parallel the language of the Fourteenth Amendment to the United States Constitution. R.I. Const. Art. 1, Sec. 2 (annotated edition). The Constitutional Convention Committee Report on this subject stated that including these protections in the State Constitution `would create an independent state foundation for individual rights.' Id. (quoting the Committee Report, p. 6). It was also stated by the committee that it wanted to protect the citizens of the State if the federal judiciary were to adopt a narrow interpretation of the Fourteenth Amendment in the future. Jones v. State of R.I., 724 F. Supp. 25, 34-35 (D.R.I. 1989).
If landlords and tenants have a right to enter into agreements permitting more than three unrelated people to live together, the rights enjoyed by the tenants would clearly be characterized as "liberty interests" under the due process clause of the Rhode Island Constitution. Writing about that clause's counterpart in the Fourteenth Amendment to the United States Constitution, the Rhode Island Supreme Court declared:
 "Liberty, as meant by the clause, is a broad concept including not only freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, and generally to enjoy privileges long recognized as essential to the orderly pursuit of happiness include those explicit pledges of particular amendments of the Bill of Rights essential to the concept of ordered liberty, [citing Palko v. Connecticut, 302 U.S. 319
(1937)], as well as such implied constitutional guarantees as the right to privacy [citing Roe v. Wade, 410 U.S. 113 (1973)] and the right to travel [citing Shapiro v. Thompson, 394 U.S. 618
(1969)]. In re Advisory Opinion to House of Rep. Bill, 519 A.2d 578, 581 (R.I. 1987).[3]
In its discussion of substantive due process our Supreme Court went on to say that the presumption of constitutionality generally afforded legislative enactments gives way "[w]here the legislation infringes upon explicit constitutional rights, such as those guaranteed by the First Amendment, or upon interests fundamental to our society of ordered liberty. . ." 519 A.2d at 582. In such situations the Court will apply a standard of "much stricter scrutiny" and will require that the "legislative enactments. . . be narrowly drawn to express only a compelling state interest." 519 A.2d at 582.
The succinct analysis of substantive due process in In ReAdvisory Opinion presaged by five years in its outline and implications the discussion of the same topic by the United States Supreme Court in the watershed decision of PlannedParenthood of Southeastern Pennsylvania v. Casey, 505 U.S. ___, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). While the objective of the United States Supreme Court in Planned Parenthood was clearly to revisit Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and put to final rest legal — if not popular — disputes regarding the continuing vitality of that case, the Supreme Court's lengthy elaboration on the meaning and methodology of substantive due process will effect for years to come many more interests than those at stake in the abortion controversy.
If there ever was any doubt, it is now beyond debate that modern-day substantive due process analysis begins with the famous dissent of the second Justice Harlan in Poe v. Ullman,367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961).
Three justices — Mrs. Justice O'Connor, Mr. Justice Kennedy, and Mr. Justice Souter — announced the judgment of the court.[4]
In their discussion of substantive due process, the three justices writing for the court noted that "[n]either the Bill of Rights nor the specific practices of States at the time of the adoption of the Fourteenth Amendment marks the outer limits of the substantive sphere of liberty which the Fourteenth Amendment protects." 505 U.S. at ___, 112 S.Ct. at 2805, 120 L.Ed.2d at 696. See, U.S. CONST. amend IX. The Supreme Court proceeded to call upon the second Justice Harlan's discussion in Poe v.Ullman:
 `The full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This "liberty" is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints, . . . and which also recognizes, what a reasonable and sensible judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment.' Id.
(citing Poe, 367 U.S. at 543, 81 S.Ct. at 1777, 6 L.Ed.2d at 1019. (Harlan, J., dissenting from dismissal on jurisdictional grounds).
In building upon Mr. Justice Harlan's analysis, the three justices provided guidance for lower courts called upon to measure legislative enactments against claims that liberty interests were being violated:
 The inescapable fact is that adjudication of substantive due process claims may call upon the Court in interpreting the Constitution to exercise that same capacity which by tradition courts always have exercised: reasoned judgment. Its boundaries are not susceptible of expression as a simple rule. That does not mean we are free to invalidate state policy choices with which we disagree; yet neither does it permit us to shrink from the duties of our office. 505 U.S. at ___, 112 S.Ct. at 2806, 120 L.Ed.2d at 697.
The Supreme Court noted that of necessity legislatures will often choose their statutory solutions from two or more competing options:
 It is conventional constitutional doctrine that where reasonable people disagree the government can adopt one position or the other. [Citations omitted]. That theorem, however, assumes a state of affairs in which the choice does not intrude upon a protected liberty. . . . . [Citations omitted]. 505 U.S. at ___, 112 S.Ct. at 2806-2807, 120 L.Ed.2d at 698.
Using the substantive due process mode of analysis set forward in Planned Parenthood v. Casey, this Court concludes that the plaintiffs in the instant matter have a liberty interest which permits the landlord plaintiffs to allow occupancy of their single units by more than three unrelated individuals and the tenant plaintiffs have a concomitant liberty interest to come together in groups larger than three to rent and occupy such units. While an examination of the decision of more than three otherwise competent adults to share living quarters together is not likely to provoke the clamor of a decision to abort, one's choice of living location and apartment mates or housemates clearly is an option that has been exercised without governmental interference by countless people since the settling of this country. Narragansett has no rational reason, let alone a compelling one, to curtail such living arrangements, especially in light of the declarations by its three top law enforcement officials that neither the number of occupants in a dwelling place nor marital status or consanguinity affects disorderly conduct.
The fact that the contested provision is the first of its kind enacted in Narragansett — and that its enactment comes more than three centuries after Narragansett was first settled — is as clear a support as can be imagined for the existence of a tradition in that town that persons can live with whom they choose without interference by the town council.
Indeed, if there is anything in the history, traditions or common law of the State of Rhode Island demonstrating that the sovereign people have at any time ceded to legislators the power to prohibit or burden choices by adults to live in areas designated for residence because they are not related by way of marriage, adoption or consanguinity, it has not been called to the attention of this Court.
It is clear that liberty of choice in such matters is a fundamental right protected by the due process clause of the Rhode Island Constitution.
Equal Protection
As with substantive due process, in the domain of equal protection analysis, the Rhode Island Supreme Court has followed the methodology that has evolved in the jurisprudence of the United States Supreme Court. In Kleczek v. The Rhode IslandInterscholastic League, Inc., 612 A.2d 734 (R.I. 1992) the Rhode Island Supreme Court describes the three-tiered approach to equal protection analysis. The most stringent tier is strict scrutiny:
 Strict-scrutiny review is applied to all statutes and state-supported rules that classify individuals by race or ethnicity. Classifications by race or ethnicity demand strict scrutiny because no situation justifies the state from classifying individuals by race or ethnicity. Classifying persons according to race or ethnicity is more likely to reflect prejudice than legitimate public concern. Thus the strict-scrutiny analysis is applied, and almost without exception racial or ethnic classifications are struck down as violations of equal protection. 612 A.2d 736-737.
 `In order "to pass constitutional muster, [the classifications] must be justified by a compelling governmental interest and must be `necessary * * * to the accomplishment' of their legitimate purpose.'" 612 A.2d at 736. (Citing Palmore v. Sidoti, 466 U.S. 429, 432-33. 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421, 425 (1984).
 * * * *
A more relaxed standard of judicial examination is "intermediate scrutiny," which is generally applied to classifications by gender "because most, although not all, gender classifications by the State are not justified;" and gender classification will be "upheld if the State can demonstrate an important government objective." 612 A.2d at 737.
Lastly, the rational basis test involves the greatest deference by the examining court to the legislature. "According to this standard, the classification is evaluated to determine if the State had any rational basis for enacting the classifications at issue in the particular statute." 612 A.2d at 737.
The classification challenged in this matter expressly references blood relationships as one criteria. Persons not related by blood (or marriage or adoption) may not live together in groups larger than three, while those who are so related may do so.
As we are taught by the United States Supreme Court that "the proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant," Planned Parenthood v. Casey, 505 U.S. at ___, 112 S.Ct. at 2829, 120 L.Ed.2d at 726, we must note the obvious, and that is that for no other reason than a lack of consanguinity, otherwise legally competent individuals are prohibited from living in zones designated expressly and principally for residential use.
With ways and means too obvious and too numerous to describe, government at every level has passed laws prohibiting racial and ethnic discrimination in a myriad of matters ranging from employment to housing and education to public accommodations; and all of these laws are grounded on the proposition that skin pigmentation and ancestry have nothing whatsoever to do with an individual's capacity to hold a job, attend a school or live in the house and neighborhood of one's choice. Here, there is no overt racial or ethnic classification, but Narragansett has selected consanguinity as one criteria permitting occupancy by more than three people in a unit located in a residential zone.[5]
Relationship by blood is every bit as irrelevant as connection to others by way of skin pigmentation or ancestry traceable to a common location when matters such as jobs, education or housing opportunities are concerned. Just as one may not be burdened by one's membership in a racial or ethnic group, one may not gain a preference because one can qualify as a member of a racial or ethnic group, at least not in those situations where otherwise blameless individuals are thereby prejudiced.University of California Regents v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978).
 If it is the individual who is entitled to judicial protection against classifications based upon his racial or ethnic background because such distinctions impinge upon personal rights, rather than the individual only because of his membership in a particular group, then constitutional standards may be applied consistently. . . . When [political judgments] touch upon an individual's race or ethnic background, he is entitled to a judicial determination that the burden he is asked to bear on that basis is precisely tailored to serve a compelling governmental interest. 438 U.S. at 299, 98 S.Ct. at 2753, 57 L.Ed.2d at 777.
Just as Narragansett could not lawfully pass an ordinance designed to set aside a particular residential zone for the members of one ethnic group — even if substantial numbers of that group thought the concept a benign or salubrious one — the town cannot, in effect, set aside its residential zones for use only by people who have the good fortune to be related by blood. Accordingly, this Court concludes that it is permitted to use strict scrutiny regarding the consanguinity classification; and upon doing so, it is clear that that classification is invalid and in derogation of the equal protection clause of Article 1, Section 2 of the Rhode Island Constitution.
The Court is aware that the other criteria, namely relationship by marriage or adoption, create a classification, i.e., the traditional family unit, that has long enjoyed legal protection and is not inherently suspect as being invidious. In the Narragansett ordinance, however, the favored position of persons related by marriage or adoption cannot pass the minimal scrutiny of the rational basis test, and thus the entire challenged provision is unconstitutional.
A recent decision of the United States Supreme Court sets forward the yardstick for rational basis review under the Equal Protection Clause. The mandate of the clause is satisfied: "[1] So long as there is a plausible policy reason for the classification [Citations omitted], [2] the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decision maker, [Citation omitted] and [3] the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational [Citation omitted]." Nordlinger v.Hahn, 505 U.S. ___, 112 S.Ct. 2326, 2332, 120 L.Ed.2d 1, 13 (1992).
Another United States Supreme Court decision declares that "a State . . . has no obligation to produce evidence to sustain the rationality of a statutory classification." Heller v. Doe, 509 U.S. ___, 113 S.Ct. 2637, 125 L.Ed.2d 257, 271 (1993); yet, in practice, the Court often scrutinizes the record when applying this lowest tier of analysis.[6] See, e.g., Turner v.Safley, 482 U.S. 78, 97-98, 107 S.Ct. 2254, 2266, 96 L.Ed.2d 64, 84 (1987) and City of Cleburne. Texas v. Cleburne Living Center.Inc., 473 U.S. 432, 448, 105 S.Ct. 3249, 3259, 87 L.Ed.2d 313, 325 (1985).
It would seem then that when a challenge is mounted to the constitutionality of a presumptively valid statute or ordinance, the governmental entity seeking to defend the statute or ordinance need not in the first instance come forward with empirical data or other facts justifying the decision of the legislature. In the domain of rational-basis analysis, the "party seeking a judicial veto of a legislative act on constitutional grounds carries the burden of persuasion." Boucher v. Sayeed,459 A.2d 87, 92 (R.I. 1983). This hardly means, however, that the municipality — or state government — defending the challenged enactment may rest on a defense that is essentially circular in its reasoning: "the ordinance is valid because the legislature passed it after proper notice and with good intentions."
A court examining controverted legislation may certainly employ "common sense" in determining whether an ordinance is reasonably related to the attainment of a permissible state objective, see, Turner, 482 U.S. at 98, 107 S.Ct. at 2266, 96 L.Ed.2d at 84. And additionally, a court may take judicial notice of "legislative facts [which] are established truths, facts or pronouncements that do not change from case to case." Boucher,
459 A.2d at 92. Just as the Court need not "speculate about unexpressed or unobvious permissible state interests," 459 A.2d at 93, (citing with approval Women's Liberation Union of RhodeIsland. Inc. v. Israel, 379 F. Supp. 44, 49 (D.R.I. 1974)), the Court should not reject logic and common sense in assessing the means governmental authorities claim are necessary to obtain the legislation's objective.
The challenger of an ordinance on constitutional grounds may, of course, present evidence to the Court tending to negate either the stated objective and/or the means selected by the legislature, and in the instant matter the plaintiffs have presented such evidence. Among the documents that the parties agree are genuine and reflective of competent evidence are statements of the three top law enforcement officials in the town indicating that this ordinance has no effect whatsoever on the legislative goal of curtailing disturbances of the peace and controlling parking problems. In the face of such evidence, defendants were clearly free to submit information to the contrary if there be any, but they did not choose to do so. The record at this point takes on significance so far as review by this Court is concerned, whatever the initial obligation of the town to produce evidence in support of the enactment may have been.
How can this ordinance be anything but arbitrary and capricious as the Town of Narragansett seeks to regulate not the use to which parcels of land are put but the behavior of occupants of residential dwellings by defining the nature of the relationship among people occupying single units in the face of expressed declarations by the town's three top law enforcement officials that the number and relationship of people occupying a dwelling have nothing to do with disorderly conduct? To borrow the language of Nordlinger v. Hahn, "the relationship of the classification to its goal is . . . so attenuated as to render the distinction arbitrary [and] irrational." 505 U.S. at ___, 112 S.Ct. at 2332, 120 L.Ed.2d at 13.
There is nothing on the record to suggest — nor does common sense or any legislative facts that can be judicially noticed lead to the conclusion — that Narragansett will be a safer, quieter community with less violations of the public peace if only persons related by blood, marriage or adoption can occupy apartments and houses situated in residential zones. There is nothing on this record to suggest that teenagers living with their parents will play their Metallica or their Beethoven at lower decibel levels in the wee hours of the morning than would four unrelated monks (or nuns) — or unrelated widows (or widowers) or four unrelated Navy lieutenants. It is a strange — and unconstitutional — ordinance indeed that would permit the Hatfields and the McCoys to live in a residential zone while barring four scholars from the University of Rhode Island from sharing an apartment on the same street.
Certainly a rational-basis analysis requires a modicum of logic to inhere within the ordinance, but this ordinance is based upon a flawed premise. The legislation operates on the assumption that if some unrelated individuals sharing an apartment or house — be they students or otherwise — are rowdy and disorderly, then all unrelated persons necessarily act in that fashion and must be barred from residential zones. Elementary logic teaches us that while a specie may have the qualities of the larger genus it inhabits, the genus does not have all the characteristics of each and every specie that it contains. The United States Supreme Court has roundly condemned this approach to the creation of legislative classifications:
 The statist notion that governmental power should supercede parental authority in all cases because some parents abuse and neglect children is repugnant to American tradition. Parham v. J.R., 442 U.S. 584, 603, 99 S.Ct. 2493, 2504, 61 L.Ed.2d 101, 119 (1979) (Emphasis is the Court's).
Regardless of the point in the proceedings at which the government elects — if it ever does — to present evidence or arguments supporting the validity of the challenged enactment, the government has a responsibility to justify the legislation. The process of judicial review is generally described as an examination to determine if the legislation "fails to relate rationally to the public health and general welfare . . ."Johnson Wales College v. DiPrete, 448 A.2d 1271, 1279, n. 1 (1982). Our Supreme Court has also spoken of "examining" an ordinance or statute to ascertain its "explicit and implicit purposes and justifications . . ." Brennan v. Kirby,529 A.2d 633, 640 (R.I. 1987) (Emphasis supplied).
In Johnson Wales College, the Supreme Court of Rhode Island examined a zoning ordinance that the city of Cranston enacted in an apparent direct and pointed reaction to a purchase by the college of hotel real estate that it planned to convert into a dormitory. 448 A.2d at 1280-1281. In fashioning its legislative response, Cranston chose not to burden monasteries, convents or rectories in the same fashion as it did college dormitories. 448 A.2d at 1280. Our Supreme Court reviewed the record that had been developed at trial, which included conflicting testimony of experts, and concluded: "The record contains no evidence that establishes any sort of rational basis for these distinctions." 448 A.2d at 1280.
The Rhode Island Supreme Court was concerned about the municipality's improper "visceral reaction to Johnsons Wales' purchase of the hotel property," 448 A.2d at 1281, and noted its own earlier condemnation of an ordinance passed "in response to much public outcry," in Mesolella v. City of Providence,439 A.2d 1370, 1375 (1982).
This concern on the part of the Rhode Island Supreme Court is completely consonant with the United States Supreme Court's clear holding that partisan clamor for a particular zoning enactment, even though able to carry a majority of the legislative body, is not sufficient justification by itself to override the commands of the Equal Protection Clause:
 It is plain that the electorate as a whole, whether by referendum or otherwise, could not order city action violative of the Equal Protection Clause, [Citation omitted] and the city may not avoid the strictures of that Clause by deferring to the wishes or objections of some fraction of the body politic. Cleburne, 473 U.S. at 448, 105 S.Ct. at 3259, 87 L.Ed.2d at 325.
Finally, this Court notes the reliance of the defendants onVillage of Belle Terre v. Boraas, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), a United States Supreme Court decision upholding a similar restriction in "a village on Long Island's North Shore of about 220 homes inhabited by 700 people." 416 at 2, 94 S.Ct. at 1537, 39 L.Ed.2d at 800.[7]
Apart from the fact that the tenants and landlords inVillage of Belle Terre apparently presented a barren record to the Supreme Court regarding their claims, the Village of Belle Terre did not go into litigation burdened in the way the town of Narragansett is with a declaration by its chief executive officer that there is no relationship between public safety and occupancy of residential units by unrelated persons. The declarations of the police chief and the building official undercut Narragansett's position, but neither was more devastating than the succinct and uncontradicted statement of Narragansett's chief executive officer, Acting Town Manager Jeffrey Ceasrine:
 It is safe to say that Narragansett will continue to have a significant number of rental units due to our desirable physical location and our proximity to the University of Rhode Island. Without touching on the issue of `property rights' of either absentee landlords or permanent residents, it is my conclusion that the problems that have been reported are not tied to the number of unrelated person firmly enough to support a finite number [three (3) or (4) four] within the Zoning Ordinance for an occupancy limit. . . . (July 30, 1992 memorandum to Town Council from Jeffrey Ceasrine, p. 3.) (Emphasis supplied)
Apart from the inability of the town of Narragansett to muster the support of its three top law enforcement officials in defense of the controverted ordinance, there are other factors that militate against Village of Belle Terre standing as controlling — or even persuasive — precedent in the instant matter. In the seminal case of McGowan v. Maryland, 366 U.S. 420
(1961), 81 S.Ct. 1101, 6 L.Ed.2d 393 we are instructed that among the facts to be considered by a court reviewing an equal protection challenge is whether "local tradition and custom might not rationally call for this legislative treatment." 366 U.S. at 426, 81 S.Ct. at 1105, 6 L.Ed.2d at 399. As noted above, the type of restriction contained in the Ordinance can hardly be considered a "local tradition [or] custom" when Narragansett appears to have survived for more than three centuries without it, and now presents itself in this litigation with no information whatsoever to contradict its three top law enforcement officials or to otherwise demonstrate that some crisis, or even a substantial change in circumstances, warrants the zoning restrictions.
This Court is hardly alone in reaching its conclusion regarding the unconstitutionality of this type of restriction. Courts, including state courts of last resort, around the country have relied on state constitutions to invalidate such prohibitions. Most of these acknowledged the existence ofVillage of Belle Terre, but found it irrelevant to state constitutional interpretation or otherwise inapposite. Indeed, one State Supreme Court wondered even within six years after the decision in Belle Terre as to whether the opinion "still does declare federal law . . .". City of Santa Barbara v. Adamson,610 P.2d 436, 440, n. 3 (Cal. 1980).
Most of the state court decisions that rely upon state constitutions to invalidate such ordinances reason and write as did the Court of Appeals of New York in McMinn v. Town of OysterBay, 488 N.E.2d 1240 (N.Y. 1985):
 Manifestly, restricting occupancy of single-family housing based generally on the biological or legal relationships between its inhabitants bears no reasonable relationship to the goals of reducing parking and traffic problems, controlling population density and preventing noise and disturbance. [Citations omitted] 488 N.E.2d at 1243.
 See also, Baer v. Town of Brookhaven, 537 N.E.2d, 619 (N.Y. 1989); Delta Charter TWP v. Dinolfo, 419 Mich. 253, 271-277 (1984); City of Santa Barbara, 610 P.2d at 441-442; State v. Baker, 405 A.2d 368, 373-374 (N.J. 1979).
CONCLUSION
This Court declares that the prohibition in the Narragansett Zoning Ordinance forbidding occupancy of otherwise suitable residential units by more than three persons not related by blood, marriage, or adoption is violative of the mandates of the due process and equal protection clauses of Article 1, Section 2 of the Rhode Island Constitution. The prohibition bears no reasonable relationship to the stated goals of the town regarding public safety, noise abatement, parking or density. The Ordinance unlawfully burdens the fundamental right of otherwise competent adults to live with whom they choose; and additionally, the category relative to blood relations is an invidious classification.
As the Court had no need to address the claims by the plaintiffs for relief pursuant to 42 U.S.C. § 1983, the Court also does not address plaintiffs' claims for attorneys fees pursuant to 42 U.S.C. § 1988.
The Court does not at this time grant plaintiffs any injunctive relief as there is nothing on the record suggesting that the defendants are going to move forward on any complaint for a violation of this Ordinance that is now pending or that defendants will be seeking sanctions in the immediate future for violations of this Ordinance. Should circumstances change in this regard, plaintiffs may apply to the Court for appropriate injunctive relief in light of this Court's declaration that the Ordinance is unconstitutional.
Summary judgment may enter for the plaintiffs in accordance with this decision.
[1] The defendants denominated their memorandum, "Defendants' Memorandum in Support of Objection to Plaintiffs' Motion for Temporary Restraining Order and Motion for Preliminary Injunction," but agreed in colloquy with this Court on October 18, 1994 that this pleading was in fact their memorandum in opposition to plaintiffs' Motion for Summary Judgment. At this session, counsel for both parties further agreed that the record was in order for summary judgment, and the defendants withdrew their defense that the Attorney General had not been properly noticed.
[2] 8.5. Penalties for Violations. Any persons or corporation, whether as principal, agent, employee or otherwise, who violates any of the provisions of this ordinance shall be fined an amount not exceeding one hundred dollars ($100.00) for each offense. Each day of the existence of any violation shall be deemed a separate offense.
[3] This Advisory Opinion was submitted on January 5, 1987, almost two months to the day after the November 4, 1986 General Election in which Rhode Island voters adopted the due process and equal protection clauses into the "modern" Constitution. The discussion regarding substantive due process that is found in theAdvisory Opinion is confined to an analysis of the Fourteenth Amendment to the Federal Constitution without any reference whatsoever to the recently adopted due process clause in the Rhode Island Constitution. There is no reason to suppose that the Rhode Island Supreme Court would not now, as it did in 1987, follow the method of analysis employed by the United States Supreme Court.
[4] This is a rare occurrence. Mr. Justice Blackmun, writing in concurrence and dissent (but not from the substantive due process section of the judgment) applauded the joint opinion as "an act of personal courage and constitutional principle." 505 U.S. at ___, 112 S.Ct. at 2844, 120 L.Ed.2d at 745, and went on to characterize the decision as "a fervent view of individual liberty. . ." Id.
[5] Interestingly, Webster's Ninth New Collegiate Dictionary
has among its definitions for race: "a family, tribe, people, or nation belonging to the stock."
[6] The three tiered approach to Equal Protection analysis is not without its critics. Indeed, Mr. Justice Stevens, in an opinion joined by Chief Justice Rehnquist, wrote that the three standards do not adequately explain what the Court is actually doing in analyzing equal protection challenges and that rational basis, properly understood and applied, is suitable both as a method and for explanation. Cleburne, 473 U.S. at 451-455, 105 S.Ct. at 3260-3262, 87 L.Ed.2d at 327-330 (Stevens J., with Rehnquist, C.J., concurring). And the Rhode Island Supreme Court, when asked to apply the middle-tier analysis to a non-gender situation, responded: ". . . We decline to entangle ourselves in the constitutionally oblique debate over the applicability of a middle-tier standard of review to equal protection analysis."Boucher, 459 A.2d at 92, n. 17.
[7] This case may not even be controlling federal precedent at this time. Interestingly, the significant zoning case of City ofCleburne v. Cleburne Living Center, supra, made no mention of this short and sparse decision; but more important, the analysis employed by the Supreme Court in Planned Parenthood ofSoutheastern Pennsylvania v. Casey, supra, with its thorough exposition of substantive due process as well as its creation of a category of liberty now known as "Griswold liberty," 505 U.S. at ___, 112 S.Ct. at 2810, 120 L.Ed.2d at 702, permits a question as to whether the Village of Belle Terre would prevail today. This Court need not examine the continuing vitality, if any, ofVillage of Belle Terre, as the instant controversy is resolved solely on State Constitutional grounds.